TUTTLE, Trustee, v. CLAFLIN et al.

(Circuit Court of Appeals, Second Circuit. July 29, 1896.)

1. PATENTS—EXTENT OF CLAIMS—INFRINGEMENT—PLAITING MACHINES.
    The Crosby and Kellogg patent, No. 37,033, for a machine for crimping textile materials, construed, and *held* valid and infringed as to its second claim. 19 Fed. 599, affirmed.

2. SAME—INFRINGEMENT—ACCOUNTING OF PROFITS.
    If an infringer makes no addition to the patented machine, but merely furnishes his machine with mechanical equivalents, which may produce better work than the corresponding devices for which they are substituted, then he is bound to account for the pecuniary profit he has reaped, which profit will be measured by the difference in expense of doing the work by the patented device and by the method in use prior to the patent.

3. SAME.
    If an infringer takes the whole of the vital and effective parts of an invention, but superadds an improvement, which contributes to the saving which they make, over the old methods, then he has a right to an apportionment of the profits; the burden being upon him to show that a portion thereof resulted from the improvement which he annexed.

4. SAME.
    When an infringer uses the essential part of a patented machine, without which his infringing machine is worthless, it is no answer to a demand for an accounting of profits that his substituted equivalents improved the work of the corresponding elements of the infringed machine.

5. SAME—APPEAL—OBJECTIONS NOT RAISED BELOW.
    Where the pleadings are silent on the question of whether complainants marked their article as "Patented," or notified defendants of their alleged infringement, as required by Rev. St. § 4900, and that question was never actually raised or decided in the circuit court, it is then too late for defendants to make the point upon appeal from the final decree.

6. APPEAL—DECISION—PATENT SUITS—ASCERTAINMENT OF PROFITS.
    Where a suit in equity for infringement of a patent had been pending 18 years, had survived two masters, to whom it was referred, had been before one master for over 9 years, and finally resulted in a decree for nominal damages only, *held*, that the court, on appeal, though satisfied that the conclusions below were too sweeping in character, and that complainants were entitled to recover a substantial sum, would not remand the cause for further proceedings, but would itself, from the evidence in the record, ascertain the proper amount, and render a decree therefor.

Appeals from the Circuit Court of the United States for the Southern District of New York.

This was a suit in equity by Theodore A. Tuttle, trustee, etc., against John Claflin, as executor of Horace B. Claflin, and others, formerly partners, under the name of H. B. Claflin & Co., for alleged infringement of a patent for a machine for crimping textile materials. The patent was sustained, and held to be infringed, by the court below, and an accounting was ordered. 19 Fed. 599. The cause was afterwards heard on exceptions to the master's report, and a decree entered for complainant for nominal damages. 62 Fed. 453. Both parties have appealed.

Benjamin F. Lee, for appellant and trustee.

Edmund Wetmore, for appellees and defendants.

Before PECKHAM, Circuit Justice, and LACOMBE and SHIP-MAN, Circuit Judges.

SHIPMAN, Circuit Judge. The plaintiff, as trustee of the Elm City Company, which was an assignee of letters patent No. 37,033, dated December 2, 1862, issued to C. O. Crosby and Henry Kellogg, for a machine for crimping textile materials, brought a bill in equity July 10, 1878, against the individuals formerly composing the firm of H. B. Claflin & Co., which alleged an infringement of said patent, and prayed for an injunction and an accounting. Temporary injunction having been granted, the circuit court for the Southern district of New York, upon "final hearing," passed a decree, April 3, 1884, which adjudged that the defendants had infringed the second and fourth claims of the patent, and directed an accounting. 19 Fed. 599. The patent had in 1873 been sustained by Judge Woodruff, in the case of Elm City Co. v. Wooster, 6 Fish. Pat. Cas. 452, Fed. Cas. No. 4,415. On August 26, 1893, the special master filed his report, which assessed no damages, and found that in the years 1873 and thereafter, until and during 1879, the defendants had in use in their business, at various times, four roller plaiting machines, all which infringed the second and fourth claims of the letters patent in suit, and upon which they had plaited 483,910 yards of goods, and that the saving which had resulted from the use of said machines, over the only pre-existing method of plaiting, which was by hand, was $76,215.85, and reported said sum as the profits, gains, and advantages which they had derived by reason of their infringement. The defendants having filed exceptions to this report, some of which were sustained, the court set aside the report, and, in its final decree, directed that the complainant recover of the defendants six cents as nominal damages, and costs for all proceedings prior to and including the order of reference, and that the costs before the master be taxed in favor of the defendants. From this decree each party appealed, the defendants from that portion which adjudged that there had been an infringement of claims 2 and 4 of the patent, the complainant from the whole of the decree, except that portion which recognized the validity of the patent and the infringement of claims 2 and 4,—and directed the payment of costs.

The question of infringement is naturally to be first considered. The machine was for crimping or plaiting textile materials, and, as shown in the drawings of the patent, was a sewing-machine attachment, but the specification and claim 1 declared that it was to be used either with or without sewing mechanism. The plait-forming mechanism was simple, but, for the purposes for which it was used, was novel. Its position in the history of the art will hereafter be considered. It consisted of a blade of metal, called a "crimper," and the presser plate, which, in connection with the cloth plate or table, was a holder, and was also a presser or smoother of the plait. If the plait was wider than the presser foot, two additions on each side of the presser foot served as supplementary smoothers. A spring pressed upon the blade as it advanced to form the plait, and was relaxed when the blade was retracted. The blade, in its forward motion over the table, gathered up the material into a partially formed plait, passed with it under the presser foot, pushed it forward between the presser foot and the table, so that the plait was flattened, smoothed, and brought to a sharp edge. The operation of the machine, including the sewing mechanism, which served to stitch the crimp, is described in the specification, as follows:

"An end of a strip of muslin is to be laid upon the platform under the crimper and under the presser foot, and the needles will descend, and have their loops secured by the loopers. While the needles are still in the cloth, the crimper has retreated as far as possible from them. The crimper presser then descends, forced down by its spring, and bears the crimper upon the goods. The latter then advances, and makes a crimp of the cloth lying be-

tween it and the line where the cloth is grasped between the presser foot and the table (see Fig. 14a), the crimper being actuated by the cam j. The latter then holds the crimper at rest, and the needles leave the cloth. The cam k then acts upon the crimper, and it shoves the cloth and the crimp just made under the presser foot, the latter smoothing down or flattening the crimp by its spring pressure upon the goods. During this second advance of the crimper, it pushes the goods along under the presser foot. The crimper now pauses, and the needles enter behind the crimp just formed. (See Fig. 14B.) Cam i now comes into action, and lifts the crimper presser, relieving the crimper from the pressure of the spring, so that the crimper may slide back without any tendency to ruck up the goods; and, when m is elevated, the cams j and k permit the spring to draw the crimper back, ready to take a new crimp. * * * After the crimp is formed, it acts as a spacer to space the crimps apart, and as a pusher to force the goods through the machine. The presser foot and the table in conjunction act as a holder, holding the goods at rest while the crimp is formed; and the presser foot alone acts as a smoother, flattening the crimp down smooth and to an edge, while the goods are being crimped or pushed forward by the crimper."

The specification also said that the patentees intended at some time to add to the machine an ordinary rough surface feed, acting below the cloth and feeding, as the crimper shoved the goods, in order to aid the latter in forcing the finished crimp along when there was a heavy pressure upon the presser foot. They also intended to attach a weight to the finished end of the crimp, to aid in drawing it along when the pusher was doing its work.

The second and fourth claims are as follows:

"(2) In combination, a crimper and a smoother, substantially such as described, and acting, substantially as specified, to fold the crimps to an edge."

"(4) In combination with a crimper, substantially such as specified, a spring acting to force said crimper upon the goods while crimping them, and relaxing its pressure while the crimper is retreating, substantially in the manner and for the purpose specified."

The defendants' machines, known as roller plaiting machines and as the Griffith and Fanning machines, from the names of the machinists who made them, were, in their important particulars, constructed like the machine described in the English patent, to James Orr, of November 4, 1867, which was never patented in this country. These machines did not contain any sewing mechanism, and consisted in general of a wide reciprocating blade and a yielding upper roll and a metallic lower roll. The blade is caused to advance to and recede from the bite of the rolls. As it advances over the surface of the lower roll, it forms a plait of the textile material lying between it and the surface of this roll, and this partially formed plait is delivered to the bite of the two rolls, which are a smoother and a holder. These rolls are revolved intermittently, and, when they revolve, feed or pull the plaited fabric. The upper roll is the equivalent of the presser foot, and, in fact, a roller presser foot is old in sewing machine mechanisms. The lower roll is the equivalent of the table or cloth plate of the Crosby and Kellogg machine, and the substitution of rollers for flat surfaces was an obvious mechanical transition. These machines were introduced when plaits upon wider strips of cloth than could ordinarily be presented to a sewing machine became fashionable, and when it was also important to have a machine which could readily adapt itself to cloth of different thicknesses. When sewing mechanism was not needed,

the advantage of two rollers or revolving surfaces to which the plait is presented, and between which it passes over two flat surfaces between which it is pushed, is obvious. The metallic roll is heated, so that the plait is ironed as well as smoothed.

The argument of the defendants in support of their theory of non-infringement of the second claim is based upon the part of the specification which says that, after the needles leave the cloth, a cam shoves the cloth and the crimp just made under the presser foot, the latter flattening the crimp by its spring pressure, and that the crimper, during this, which is its second advance, pushes the goods along under the presser foot. The defendants' construction of the second claim is that it is limited to what is called the "second operation" of the machine, viz. that of folding the crimper to an edge by the combined action of the crimper in pushing the formed crimp along, and of the smoother pressing down upon it, as it is thus pushed forward, whereas they say that in the defendants' machines the crimper performs no part of folding to an edge, and that there is no conjoint action for this purpose between the crimper and the smoother. The position that the second claim is limited to such a construction of crimper and smoother that both must continuously act together to fold the crimp to a perfect edge is neither required by the specification nor by the claim. The former speaks of the crimp as formed—i. e. partially formed—before it is pushed under the presser foot, and as flattened down to an edge as it is pushed through. In like manner, in the defendants' machines, the crimper is folded, though not to a complete and perfect edge, when the blade pushes it up to the surface of the lower roller, delivers it to the grasp of the two rollers which fold the crimp down over the edge of the crimper, and, as the blade recedes, completes the work of smoothing and polishing. The defendants' construction of the claim would have the effect of limiting it to a flat presser foot, between which and a flat table the crimp must be pushed; in other words, to a machine in which the crimper spaces the crimps. In the language of Judge Wallace upon "final hearing":

"While the defendants' machines do not employ a crimper which operates independently to space the crimps, their crimper and smoother effect the operation of folding the crimps to an edge, and their devices in this behalf are the substantial equivalents of those in the combination described in the second claim. In their machines, the spacing is done by revolving rolls or holder, which, after each crimp is formed, advances the cloth while the blade is retreating through a distance equal to the space between the successive crimps."

It is next said that the defendants' machines do not infringe claim 4. As the patent has expired, and as claim 2 is the important and valuable one of the patent, it is not necessary to consider at length this question. Claim 4 is for the combination of the blade and spring, which forces the blade upon the cloth when crimping is done, and relaxes its pressure when the crimper is retreating. The Fanning machine has a spring which does this precise work in the same way. The Griffith machine has no spring, but the blade is rocked by the moving mechanism down upon the cloth, and, as it retreats, is rocked away from the cloth. It is not necessary to dis-

cuss at length the importance of the infringed claims with relation to the entire invention of the patentees. The master, in his report, found that the invention of claim 2 was the essential feature of both the Griffith and Fanning machines, without which they would have been worthless. This feature was the blade which folded the material upon itself, and, taking the plait to the smoother to be ironed, acted in combination with the smoother, and was the gist of the invention, without which plaits could not be made.

But the defendants say that, even if the infringers took the essential part of the patented machine, it was itself but an improvement upon the George B. Arnold patent, of May 8, 1860, and was not essential to plaiting mechanism, and thereby attempt to bring the case within the principle of Garretson v. Clark, 111 U. S. 120, 4 Sup. Ct. 291. The object and scope of the Arnold machine sufficiently appear in his original specification, and were to gather up one piece of cloth in small even folds or corrugations, and to sew it to another piece of cloth not so gathered. The patentee said:

"By my invention, I am enabled to take two pieces of cloth of unequal lengths, and placing their edges together with the longer piece at the bottom, and by running them through the machine, not only to gather the bottom cloth to any desired degree of fullness, but to sew them firmly together at the same time."

It was strictly an attachment to a sewing machine, and depended for its success upon sewing mechanism, but could be used without, and creases or gathers would be made in the cloth. It was designed to sew a ruffle upon a band, and was intended to do nothing else. The patent was reissued in 1874, and, after the custom of that period, contained claims some of which, in their broad and general language, could sweep in the Crosby and Kellogg invention; but the distinction between the two devices was correctly and forcibly stated by Mr. Brevoort, as follows:

"It [the Crosby and Kellogg machine] was a new mechanism, in contradistinction to being a mere improvement, but it was a mechanism which came under the broad terms of the Arnold reissue. It was by itself a different machine from the Arnold reissue."

The claims of the reissued patent to John A. Pipo, a reissue on July 27, 1875, of an original patent dated January 27, 1863, are of the same character. The object of the invention was simply "to provide means [in a sewing machine] for forming and sewing a ruffle between two pieces or folds of cloth at one and the same operation." The crimping mechanism of the patent in suit was original with the inventors for the formation of the ornamentation properly called "plaits," and for that purpose was a pioneer invention. The Arnold and Pipo machines merely gave hints how a plaiting machine could be made. The manufacture of plaits originated with the mechanism of Crosby and Kellogg, whose machine was not an addition to an old structure, as in Garretson v. Clark, supra, or in Reed v. Lawrence, 29 Fed. 915.

Upon the foregoing facts, the question of the rule of law in regard to the method of ascertaining the profits was not a debatable one. If the defendants had made no addition to the Crosby and

Kellogg invention, it being one of an original and primary character, they took it as it was, although they furnished their machines with mechanical equivalents which might produce better work than the corresponding devices for which they were substituted, and the complainants would be entitled to the pecuniary advantage which the infringers derived from their unauthorized use of the patent, the profit being in this case the difference between the expense of plaiting by the use of the patented device and the expense of doing the same thing by hand. Mowry v. Whitney, 14 Wall. 620; Cawood Patent, 94 U. S. 695; Thomson v. Wooster, 114 U. S. 104, 5 Sup. Ct. 788; Sessions v. Romadka. 145 U. S. 29, 12 Sup. Ct. 799. The defendants insist, however, that they made additions which materially benefited the machines, and increased their effective power. If this is true, although they took the whole of the vital and effective part of the invention, but superadded and annexed an improvement which contributed to the saving which they obtained, they have a right to an apportionment, the burden being upon them to show that a portion of the profits was the result of the improvement which they annexed. Elizabeth v. Pavement Co., 97 U. S. 126; Crosby Steam Gauge & Valve Co. v. Consolidated Safety Valve Co., 141 U. S. 441, 12 Sup. Ct. 49.

The defendants satisfied the circuit court that the combinations of claims 2 and 4 would not produce the finished product of the infringing machines, and that the features added by Orr, Griffith, and Fanning, and particularly the ironing feature, must have contributed something to the value of the machines, and that it was erroneous to say that the whole value was due to the Crosby and Kellogg invention. From 1871 to 1879 the trimming or ornamentation of ladies' dresses by means of plaits was universal. They were used upon materials of all kinds, as well those of linen and cotton, which were made up into cheap suits, as those of woolen and silk. The roller machines were exclusively for the manufacture of these plaits upon strips of cloth usually of four inches, sometimes of six inches, in width, which were not stitched on the machine, and were nicely ironed. It is manifestly true that the patented machine, as shown in and while attached to a sewing machine, was not practically adapted to the exclusive manufacture of plaits which were not stitched. It becomes important, in view of the conclusions of the circuit judge, to ascertain to what extent and in what particulars improvements were made which brought the defendants' machines to their position of commercial importance.

The defendants first asserted that, if the sewing mechanism was detached, the machine could not make merchantable plaits, unless it had additional feeding mechanism other than a four motion feed, and that such mechanism must be produced by inventive skill. This statement would have seemed trustworthy but for the subsequent introduction into the case of the five machines and the bias plaiting machine made by Mr. Walker in 1871, and efficiently used as commercial machines while the fashion for plaits lasted. They were the patented machines without the stitching mechanism, and with the ordinary rough surface feed spoken of in the specification.

If heat was required, it was furnished by means of gas, which was carried in a pipe under the bed or cloth plate. These machines effectually disposed of the theory that sewing mechanism was indispensable in the practical operation of the Crosby and Kellogg machines.

The next position of the defendants was that the leading improved feature of their machines was the feeding mechanism, which consisted of the two rollers which were not the feeding device of the patented machine, and required invention to produce. But it was conceded that a roller presser foot was an early device in sewing machines, and that the upper roll acted substantially as a presser foot, with the additional function of helping to feed. When the presser foot became a roller in a plaiting machine, the table must also become a roller, and thus rollers were naturally substituted for plates. When thus substituted, they also, from the manner in which they necessarily operate, and as incidental to the work of holding and smoothing, are a feed which pulls the farbic along. This fact is insufficient to constitute them a new addition to the Crosby and Kellogg machine. That had also a feeding mechanism, and nothing has been superadded. When the infringer uses in his infringing machine the essential part of the patented machine, without which his infringing machine is worthless, it is not an adequate answer to the demand for the payment of his entire profits that his substituted equivalents improved the work of the corresponding elements of the infringed machine. The heating of the lower metallic roll, and thereby making it a device for ironing as well as smoothing, was an addition, though not a patentable one, which was not made of importance in the testimony, but it was of pecuniary importance and benefit. If the work had been done by hand, it would have been necessary to press down each fold with a hot iron as soon as made; and heat must be applied to machine-made goods in order to make them a finished article. The heated roll, so far as it was a mangle, was an annex to the existing mechanism; and, if it was a superaddition which produced a pecuniary benefit in its operation, it is not of importance that it had been used before in like machines. It follows that so much of the cost of making plaits by hand as included the cost of ironing should be deducted from the savings which the master found were derived from the use of the infringing mechanism, and it is probable that the master would have done so if the defendants had furnished any data from which the computation could have been made. Crosby Steam Gauge & Valve Co. v. Consolidated Safety Valve Co., supra. In the opinion in the Crosby Case, which related to a patented valve, it appears that no evidence showed that any of the improvements which were patented after the issuance of the infringed patent, and which were owned by the defendant, gave any advantage in selling the infringing article, and therefore no allowance was made for the alleged benefit created by such improvement.

The master proceeded to ascertain the pecuniary advantage which the infringer derived from the unauthorized use of the patent, which was, in accordance with his previous findings of fact, the difference

between the expense of plaiting by the use of the patented device and the expense of doing the same thing by hand. He found that the expense of plaiting about 484,000 yards, if other than woolen, would have been 15 cents per yard, and that about 60,000 yards were woolen goods, which would have cost 10 cents more. We are not satisfied with the accuracy or strength of the testimony upon which this finding was made. The witnesses for the complainant made this estimate for plaiting a strip of linen four inches wide and four plaits to the inch, which was the ordinary width called for in 1887 and 1888. Plaits varied in width from one-sixth of an inch to three-fourths of an inch. The narrow plaits were the most expensive. About 75 per cent. of the material was used in a width of four inches. The remaining 25 per cent. was used in widths of from half an inch to six inches. The complainant introduced three witnesses upon the subject of the cost of hand-made goods. Kursheedt, a manufacturer of plaits, estimated the cost at $17\frac{1}{2}$ cents per yard; but he never plaited goods by hand for sale, and had no knowledge of what others paid. He did pay for making samples by hand in accordance with the time which the workmen took. Brown, a manufacturer of plaits, made attempts to manufacture by hand between 1876 and 1878. His attempts resulted in a belief that the work cost him from 15 to 20 cents a yard. Wooster, who was a large manufacturer of machine-made plaits, who is pecuniarily interested in the result of the suit, and who apparently has had no experience in hand-plaiting, estimated that such plaits would cost 20 cents per yard. Smith, the defendants' superintendent of the manufacturing part of their cloak and suit department, represented them before the master. He said nothing in regard to cost, and his only attempt to furnish testimony upon that subject was his wife's hurried experiment of about 20 minutes' duration, to ascertain the time in which she could plait goods by hand upon a sewing machine. The testimony of the complainants is unsatisfactory. Kursheedt and Wooster gave estimates only, unaccompanied with knowledge gained by experiment or by investigation. Brown made practical experiments, apparently in a small way, but all of them included the expense of ironing, which two of them seemed to regard as important, and all estimated upon plaits of a fourth of an inch in width. No account was apparently taken of the economies which would inevitably come from increased production. If the defendants had entered upon the manufacture of half a million yards by hand, the advantages resulting from a subdivision of work among experienced persons, and economical methods of doing the work by wholesale, would have manifested themselves. The estimates of these witnesses are, in our opinion, the result either of inaccurate knowledge, or of an insufficient investigation of the expenses of work upon a large scale.

The judge of the circuit court was of opinion that the facts in this case took it out of the general rule that the pecuniary advantage which the infringers derived from the unauthorized use of the patent is to be estimated upon the entire production of the infringers, because, in his opinion, the evidence showed that the defendants never

would have resorted to the hand method, because it was so expensive as to be prohibitory, and because it was impossible to make marketable plaits by hand. There may be, and probably will be, cases in which an inadvertent infringer of an old and unknown patent for the method of manufacturing an article which is made and sold by the million at a cheap rate, and which is expensively made by hand, like the article of paper bags, suggested by Judge Coxe, will have a persuasive equity against a decree for his entire profits, upon the ground that the owner of the patent suffered no damage, and that the paper-bag business was created by automatic machinery, and never would have existed if the bags must be made by hand. But the equity in this case is based entirely upon the testimony of Smith, the defendants' superintendent of manufacture, who, in answer to questions which, assuming that the cost of manufacture by hand would have been from 15 to 20 cents, asked whether it would have been practicable for the defendants to have employed such a method, replied that it would not have been, because it would have made the goods cost so much that they could not have sold them. What the effect would have been if the cost had been materially less than that which was assumed, the witness did not state; and, as we are of opinion that the assumed cost was much larger than the actual cost, the answer throws no light upon the probable conduct of the defendants. The witness, furthermore, knew nothing upon the subject of what his employers would have done if they had been obliged to lose money in this branch of their business, and they gave no testimony. They were doing a reputed business of from $30,000,000 to $40,000,000 per year. In 1878 the total sales of the cloak and suit department were a trifle below $600,000. The amount of sales of suits in that department was $131,287.03, and the amount of sales of plaited suits was $30,614.62. Whether the firm, which undertook to do a leading wholesale dry-goods business, would have permitted themselves to disregard the wants of customers by keeping aloof from an important article of trade, the witness had, apparently, no adequate means of information. The conclusion of the judge of the circuit court, that a marketable article of plaitings could not be made by hand, does not seem to have been adequately supported by the testimony. It appears that the defendants generally plaited silk and dress goods and woolen goods by hand, because the machines injured the fine goods; and when, after the injunction, hand-made plaiting was used upon ordinary suits, there was no difference in the appearance of the two classes of finished work.

The defendants' fifth assignment of error upon its cross appeal was the alleged error of the court in ordering that the complainant could recover damages and profits, and, if such a decree could be lawfully directed, in not limiting the recovery to the period subsequent to the receipt of notice to them that the Griffith and Fanning machines were claimed to be infringements. This assignment was for the purpose of taking the benefit of the decision in Dunlap v. Schofield, 152 U. S. 244, 14 Sup. Ct. 576. The bill in equity was silent upon the allegation called for by section 4900 of the Revised Statutes, that the complainants marked their machines or notified the defendants of the

infringement. After alleging the invention and grant of the patent, and the assignment, the pleader averred that the defendants, knowing the premises, infringed. This is not an averment that they had notice or knew that their machines infringed. The answer specially traversed the allegations in regard to infringement, but was likewise silent upon the subject of notice. The defendants introduced a witness in January, 1884, who made the customary proof of good faith, and that, when they were notified, they stopped the use of the machines. No point was made upon final hearing, or during the 9½ years before the master, in regard to the absence of the allegation or of the proof of notice. No exception upon that subject was taken to the report of the master. The point was not made before the court when the decree was made final, and appeared for the first time in the assignment of errors, more than 16 years after the answer was filed. The question is not whether the rules of pleading required the allegation of notice in a bill in equity which asked for damages and profits (that question is settled in Dunlap v. Schofield, supra); but it is whether the neglect to take notice of the omission, either by answer or in any other form, until after the final decree, was not a waiver of the want of notice. It was so held in Rubber Co. v. Goodyear, 9 Wall. 811, where the point of want of notice did not appear until the hearing before the master, and the court held that the triable issues must be confined to the pleadings. This was affirmed in Sessions v. Romadka, 145 U. S. 29, 12 Sup. Ct. 799. In Dunlap v. Schofield, supra (a bill in equity to recover damages), the bill and answer made the proper averments and denials, but no proof was given, and the court held that the burden of proof rested upon the complainant. In Coupe v. Royer, 155 U. S. 583, 15 Sup. Ct. 199 (an action at law), the pleadings were silent; but the question was actually litigated upon the trial by contradictory evidence, and the court thought that it should have been submitted to the jury. In this case the pleadings were silent. The question never became one actually in issue, and was never raised in the circuit court.

It is too late to raise for the first time in an appellate court technical questions of pleading or proof which are not jurisdictional in their character, and which were not raised either in the pleadings or before the trial courts, where defects might have been remedied, and which must therefore be considered to have been waived. It is therefore not necessary to consider whether the provisions of section 4900 are applicable only to cases in law or in equity, in which damages, as distinguished from profits, are the subject of investigation. The case stands on this wise: In our opinion, the conclusions of the judge of the circuit court were too sweeping in their character, and that too much importance was given to the alleged improvements which were made upon the Crosby and Kellogg machine, and to the testimony of Smith that the expense of hand-made plaits would have prohibited his employers from their use. We are, on the other hand, of opinion, that an allowance should have been made for the improvement in the defendants' machine, by which the plaits were automatically ironed, and that the estimates of the witnesses upon which the master based his findings of costs were ex-

cessive by reason of the omissions which have been mentioned. But the whole record and the silence of the defendants show that they must properly be charged with a large sum as profits. We have been in doubt as to the proper disposition of the case,—whether it should be sent to a master for rehearing, or whether this court should ascertain from the record the proper amount. Manufacturing Co. v. Cowing, 105 U. S. 253. This case has now been in court for eighteen years. It survived two masters, and was before a master for more than nine years. The lapse of time undoubtedly arose from a variety of circumstances, and we are not aware that it is attributable to the counsel in the case; but the delays which are incident to an accounting are well known, and we hesitate exceedingly to compel an additional expenditure of time. The manufacture of plaits in any large amount has now ceased, and it is very likely that further testimony would result only in estimates not the result of experience. We have therefore concluded to ascertain from the record a more satisfactory amount of profits, and conclude that a reasonable allowance will be the sum of $40,000.

The decree will be reversed, with costs of this court, and the cause remanded, with instructions to enter a decree declaring the validity and the infringement by the defendants of the second and fourth claims of the Crosby and Kellogg patent, and adjudging that the complainants recover from the defendants the sum of $40,000, as their profits, and the costs in the circuit court to be taxed.