## WOOSTER v. TROWBRIDGE et al.

### (Circuit Court, S. D. New York. March 7, 1902.)

1. INSOLVENCY—CONTRACT MADE BY TRUSTEE—VALIDITY.

A trustee for an insolvent corporation, who had instituted a suit to recover damages for infringement of a patent owned by the corporation, subsequently entered into an agreement with complainant, who had a similar suit pending, by which the latter was to take charge of both suits, employ counsel, make settlement, and indemnify the trust estate against liability for costs, and the net proceeds recovered in the two suits were to be equally divided between them. At that time neither the trustee nor his counsel believed that any damages could be recovered. Complainant lost his own suit, but he and his counsel pressed that of the trustee with such energy and success that after a long litigation a decree for substantial damages was recovered. *Held,* that in the absence of any statute making the contract illegal, or proof of bad faith on his part, the creditors of the corporation would not be permitted, after nearly 20 years' acquiescence, to attack its validity on the ground that it was improvident and ultra vires, for the purpose of defeating complainant's claim to a share of the net proceeds, but that the contract would be enforced as an equitable assignment of the fund to the extent of the share agreed upon as his compensation.

2. SAME—POWERS OF TRUSTEE—EQUITABLE ASSIGNMENT OF FUND.

It is the duty of an assignee or trustee in insolvency for the benefit of creditors of an insolvent corporation to prosecute meritorious claims to judgment, but he is not required to prosecute a doubtful claim; and a court of equity will not exact higher care or judgment in that regard than he would use for himself in the exercise of proper care for his own interests. A contract by which such a trustee gave to another full power to prosecute, compromise, or settle a doubtful suit at his own expense,—his compensation to be a stipulated share of the net amount realized,—is not an improper delegation of powers vested in the trustee alone, and will be sustained as an equitable assignment of a portion of the fund realized through the services and expenditures of the assignee.

3. PATENTS—INFRINGEMENT — DISTINCTION BETWEEN PROFITS AND DAMAGES RECOVERABLE.

A contract between the owners of two patents, covering similar inventions, by which joint licenses were to be issued at request of the second party, who was to recover a share of the license fees for the use of the patent of the first party, and also of the "damages" payable from infringers of such patent, does not entitle him to share in a sum recovered by a suit in equity as "profits" realized by an infringer, where no damages were allowed.

4. ASSIGNMENT—RECOVERY IN PENDING SUIT—EVIDENCE TO ESTABLISH.

Evidence considered, and *held* insufficient to sustain a claim to a fund recovered for infringement of a patent, based upon an alleged verbal assignment of the patent and the recovery, while the suit was pending, to a solicitor for the complainant therein.

In Equity. Suit for distribution of fund in court.

Shearman & Sterling (John A. Garver, of counsel), for complainant Wooster.

Edmund Wetmore (John K. Beach, of counsel), for defendant Trowbridge.

A. Nelson Lewis (Henry W. Taft, of counsel), for defendant Lewis.

HAZEL, District Judge. The complainant, as assignee of George H. Wooster, deceased, brings this suit in equity, and prays for a de-

cree declaring and adjudging her to be the owner and entitled to three-quarters of the balance of a fund amounting to $24,063.41, with accrued interest, remaining in the custody and control of this court. The deposit of the original fund of $43,557.27 was made to await the determination of all claims thereto pursuant to an order made and entered April 19, 1897. Subsequently, by order of this court, there was paid therefrom for counsel fees, master's report, and disbursements incurred by complainant's assignor, the sum of $19,493.86, leaving the aforesaid balance on deposit in this court. The fund was realized as a result of perplexing and protracted litigation in a suit commenced in this court July 10, 1878, by Theodore A. Tuttle, trustee in insolvency for the benefit of creditors of the Elm City Company, a corporation organized under the laws of the state of Connecticut. The right of the trustee to bring the suit without first obtaining leave of court having jurisdiction of insolvent estates is clear. By the general statutes of Connecticut (Revision of 1875), trustees in insolvency are expressly empowered to sue in their own names any claim belonging to an insolvent debtor's estate. The Elm City Company, at the time of the appointment of a trustee for the benefit of its creditors, owned many patents,—among them, the Crosby & Kellogg patent, so called, No. 37,033, granted December 2, 1862; being a device for plaiting and ruffling attachments to sewing machines. The Elm City Company became its owner by assignment. This was the patent relied on in the suit commenced by Tuttle, trustee, against Horace B. Claflin et al. for its infringement. This suit was terminated in favor of the trustee, and resulted ultimately in the recovery of a substantial sum for profits of Claflin arising from the illegal use of the Crosby & Kellogg patent. There are four claimants to the fund. The complainant, as already stated, claims three-quarters; Lewis, cross claimant, three-quarters; Mrs. Tillinghast, cross claimant, one-quarter; and Trowbridge, defendant and trustee of the Elm City Company, vice Tuttle removed, claims that he is entitled to the entire fund, for the benefit of the insolvent estate.

It is essential to a complete understanding of the controversy that the status of the claimants, the amount of money which they claim, and the source of the title which they assert, be made as clear as possible. The claim of complainant will first be considered. She claims title from two separate sources, to wit, to one-half interest in the fund by reason of a contract entered into June 16, 1883, by and between Tuttle, as trustee, Charles B. Stoughton, his attorney and solicitor at the time in the suit brought against Claflin & Co. to sustain the validity of the Crosby & Kellogg patent, and George A. Wooster, complainant's husband, and assignor of the claim sought to be established by this suit. This contract, for convenience, will hereafter be referred to as the "Three-Party Agreement." At the time of its execution, and prior thereto, Wooster was the owner of the Pipo reissue patent for an improvement in sewing machines for making band ruffling,—a device similar to that of the Crosby & Kellogg patent. The Pipo reissue was also claimed by Wooster to be infringed by Claflin & Co. It had been sustained at final hearing (Wooster v. Blake [C. C.] 8 Fed. 529), and in 1881 Wooster obtained an inter-

locutory decree in a suit which he had brought against Claflin & Co. to restrain infringement of the Pipo reissue. The initiatory success attained by Wooster against Claflin was tenaciously and aggressively combated by able counsel. The contention was that reissuing patents for the purpose of enlarging their claims was invalid, on the authority of James v. Campbell, 104 U. S. 356, 26 L. Ed. 786, and Miller v. Brass Co., 104 U. S. 350, 26 L. Ed. 783, and that the Pipo reissue came within the scope of these authorities. Justice Blatchford, who heard the case, dismissed the bill, and declared the reissue of the Pipo patent invalid as to essential claims. Wooster v. Handy (C. C.) 21 Fed. 51. This was in July, 1884. The three-party agreement was entered into one year prior thereto, and provided that Wooster and Tuttle would, at their own expense, push both suits against Claflin & Co. to a final determination; Wooster to receive the gross proceeds, and make equal division thereof between Tuttle and himself. It was further provided that Wooster should be empowered, at his election, and at his own expense, to proceed with both the Pipo and Tuttle suits, and that he alone should have power and authority to make settlements. The basis for complainant's claim to an additional one-quarter interest in the fund arises out of an agreement made September 7, 1877, by Tuttle, as trustee for creditors, and Alexander E. Kursheedt (hereinafter referred to as the "Kursheedt Agreement"). Kursheedt was interested in the Arnold patent for a similar device to that of the Crosby & Kellogg patent, and, by the terms of the agreement, Tuttle and Kursheedt united their interests in both patents, and agreed to grant joint licenses. It was agreed that the licenses were to be issued by Tuttle, at the request of C. B. Stoughton, and by him delivered to Kursheedt. Negotiations for licenses were to be conducted solely by Kursheedt, the terms of the grants to be approved by Stoughton. The license fees under the Crosby & Kellogg patent, and sums payable for damages for infringement thereof, were, by the terms of the agreement, made payable to Kursheedt, and from the sums so received by him he was authorized and empowered to retain 25 per cent.; the balance to be paid to Stoughton, who was authorized to retain $2,500 to meet any expenses of litigation or other disbursements necessarily incurred to enforce the Crosby & Kellogg patent. On February 20, 1890, Kursheedt assigned his interest arising from the foregoing agreement to Wooster. Subsequently, on February 27, 1888, a further agreement was made in writing by and between Tuttle, as trustee, and Wooster, by which the three-party agreement was modified, and the intent of the parties explained. Stoughton is not a party to this agreement. It provides that Wooster shall have exclusive right and power to settle, adjust, and continue or discontinue the suits specified in the three-party agreement upon such terms as Wooster may deem proper and just. Tuttle agrees that Stoughton, his attorney, shall execute such papers as may be necessary to effect the settlement. Wooster is given the authority to execute all necessary conveyances and instruments to bring about that end, and to employ counsel to represent Tuttle in the suit brought by him against Claflin. Simultaneously with the execution of the foregoing agreement, Wooster, in writing, indemnified and holds

Tuttle harmless from all costs and expenses arising out of the prosecution of either the Pipo suit or Tuttle suit. The agreement further provides that Wooster shall be reimbursed for expenditures made in the prosecution of said suits, or either of them, and that his expenditures be deducted from the proceeds before division thereof, in accordance with the three-party agreement. The effect of these latter instruments was to grant to Wooster absolute control of the then pending litigation between Tuttle and Claflin. It satisfactorily appears from the record that the claim for profits earned by Claflin & Co. by reason of wrongful use of the Crosby & Kellogg patent, and the right to recover the same, was viewed with more or less doubt and skepticism. It was regarded as worthless by the trustee and his advisers. Eminent counsel, learned in the patent law, looked upon the claim as difficult to establish by proper and sufficient proof. Overtures of settlement of the Pipo and Tuttle suits, made by Wooster to Claflin & Co., on a basis of $2,500, were declined. It was fairly assumed that, owing to a change in the fashions and style of dress then prevalent, extreme difficulty would be experienced in obtaining evidence justifying a recovery of profits resulting from the illegal use of this device. Its utility was dependent on fashion, and was therefore of short duration. The profits were earned and damages sustained a number of years prior to the suit. Notwithstanding apparent obstacles to success, Wooster, in 1890, acting upon the authority of the agreements with Tuttle, stimulated, doubtless, by the additionally acquired interest of the Kursheedt agreement, employed solicitors and counsel to energetically prosecute claims for profits arising from the infringement of the Crosby & Kellogg patent. The proofs show that intricate and complex questions of law and fact were involved and judicially determined. This phase of the controversy, however, is only important to elucidate the hesitation with which the trustee was imbued, and the prevailing motive and intent which prompted and induced the Wooster agreements. It is unnecessary to point out in detail the valued and extensive services which Wooster undoubtedly rendered. It is sufficiently proven that he was the main, if not the sole, factor in quickening enervated legal machinery. After more than a decade, by the expenditure of time and means, dilatoriness of procedure disappeared. The three-party agreement and subsequent agreements, in clear, precise, and unambiguous language, to which Tuttle gave assent, constituted his warrant of authority, and may be justly construed in the nature of an employment to aid the trustee in the performance of a duty devolving upon him. Wooster was given no right or power to bind the estate in a transaction which, in the then state of affairs, was not advantageous to the creditors. Through his vigorous and well-directed energy, the patent suit, pronounced by the circuit court of appeals for this circuit as "both remarkable and unique," came to final judgment, only to again become the subject for judicial determination by reason of adverse and conflicting claims to the final award. The contentions insisted upon with much earnestness by counsel for trustee, Trowbridge, to defeat Wooster's right to a distributive share under the three-party agreement and subsequent agreements are (1) that such agreements

were improvident and ultra vires, and have never been ratified or sanctioned by the creditors of the Elm City Company, or the probate court of the city of New Haven, and therefore cannot be enforced; and (2) that the consideration for the agreements is inadequate and speculative, and based upon a gross breach of trust and fraud upon the creditors, and that no recovery can be had here upon a quantum meruit.

The circuit court of appeals for this circuit (Judge Shipman speaking for the court), when the case of Tuttle v. Claflin, 31 C. C. A. 419, 88 Fed. 124, was before that court on review of a report of the master allowing counsel fees, etc., to be paid out of the fund, said:

"The appellants insist that the contracts made by Tuttle as trustee were improvident and ultra vires, and that the entire fund should be sent to the probate court of New Haven, which has charge of the settlement of the estate of the Elm City Company, and which should make the proper allowance, if any, for services. Inasmuch as Wooster was fully clothed with the apparent power to employ counsel, as the trustee took no part in the litigation, paid and proposed to pay nothing to relieve the estate from all liability in case of nonsuccess, and as the fund was obtained by the disbursements of Wooster and the services of those whom he employed, they have an equitable lien upon it; and the circuit court, which properly has control of the fund, should adjust the amount of the liens for these services before transmitting it to another jurisdiction."

The services specified in the foregoing excerpt from Judge Shipman's opinion were performed by counsel employed by Wooster at a fixed percentage of the gross amount recovered. The contention insisted on at the hearing before the circuit court of appeals, in opposition to allowing counsel compensation pursuant to contract with Wooster, was similar to that urged on this hearing. The decision of the circuit court of appeals upholding the contract that Wooster made with his counsel seems to me to be clear authority in favor of the trustee's power to make the agreements in suit. A trustee for the benefit of creditors is merely the representative of the debtor, and obtains his power from the assignment and the statutes. Perry, Trusts, 597. Therefore, whenever it is urged that an assignee or trustee for the benefit of creditors has done an act outside of the scope of his authority, it is pertinent to make inquiry as to the nature and extent of that authority. It is clear that such a trustee is limited to the performance of such duties and powers only as are contemplated by the trust. The rights of creditors which flow from the creation of the trust are of primary concern. When a trustee omits the performance of those duties which the law demands, a court having jurisdiction may compel such recalcitrant trustee to observe a proper and faithful stewardship. I do not think that after the lapse of a score of years, during which period of time the creditors must be presumed to have had knowledge of acts performed by the trustee within the purview and scope of his authority, creditors can be heard to say to a court of equity that the trustee exceeded his powers. During all of these years the litigation against Claflin & Co. was carried on in the name of the trustee. No opposition was made on the final accounting of the trustee in the probate court. The entire subject-matter was allowed to lie dormant by the creditors until after the

award. The services rendered by Wooster were of such value that a court of equity will not deprive him of the fruits of his labor. He was guilty of no wrongful act. None of Tuttle's powers and responsibilities as trustee are committed to another by any of the agreements to which reference has heretofore been made. The poverty of the Elm City Company reasonably justified the act of the trustee in making what seemed to him to be the best and most advantageous arrangement for the cestui que trust, in the light of all the circumstances; and in the absence of a statutory provision prohibiting such agreements, or proof of bad faith on the part of the trustee, this court will require fulfillment of the terms of the contract. New v. Nicoll, 73 N. Y. 127, 29 Am. Rep. 111; Taylor v. Bemiss, 110 U. S. 42, 3 Sup. Ct. 441, 28 L. Ed. 64; Semmes v. Whitney (C. C.) 50 Fed. 666; Randall v. Dusenbury, 39 N. Y. Super. Ct. 174, affirmed in 63 N. Y. 645.

In no sense can the three-party agreement, and the agreement ratifying or modifying the same, be construed as an improper delegation of the powers vested in the trustee alone. Undoubtedly it was Tuttle's duty to actively prosecute any meritorious claims to judgment, but the law does not require him to prosecute a doubtful claim. Harrington v. Ketaltas, 92 N. Y. 45.

It follows, therefore, that a court of equity will exact no other or greater care and circumspection in behalf of a cestui que trust than the trustee, in the exercise of proper care, would exert for himself. Moreover, such agreements are more than mere undertakings to pay a stipulated sum for services performed (Tuttle v. Claflin, 31 C. C. A. 419, 88 Fed. 122); and the court of appeals of the state of New York has held (Fairbanks v. Sargent, 117 N. Y. 329, 22 N. E. 1039, 6 L. R. A. 475) that contracts by which a specific share in a specific fund or specific property is created for services rendered and to be rendered, coupled with exclusive power to settle or compromise, operate as equitable assignments of the stipulated shares so transferred, and such shares are the measure of equitable interest of the assignee in any recovery. Other authorities abound wherein a similar doctrine is applied. I therefore hold that complainant's remedy was dependent on the contract. The amount for the services of Wooster was definitely determined upon, and no claim upon quantum meruit can arise where, as in this case, the effect of the agreement makes Wooster the equitable assignee to the extent of his claim to the fund.

The question of the power of Tuttle to make the three-party agreement and subsequent agreements, ratifying and extending Wooster's authority, having been decided, another problem presents itself: Is Wooster entitled to recover an additional one-fourth of the recovery by virtue of the Kursheedt contract, and his ownership thereof? The agreement clearly entitles the beneficiary solely to a share in damages for an infringement of the Crosby & Kellogg patent. The sum to which Tuttle was found by the master to be entitled, and which is now here for distribution, was not for damages, as defined in the patent law, but for profits earned by defendants Claflin et al. from the illegal use of the patent in suit. The distinction clearly appears in

the language used in section 4921 of the Revised Statutes of the United States. By that section the complainant, upon a decree being rendered in his favor for infringement, is entitled to recover, in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby; and the court is given power to increase such damages, in its discretion, and to make assessment thereof, or cause the same to be assessed under its direction. The authorities construing section 4921 uniformly recognize a distinction between profits and damages. They require a defendant to account for what he has gained by the unlawful infringement, and, in addition thereto, damages may be awarded. Vulcanite Co. v. Van Antwerp, 2 Ban. & A. 254, Fed. Cas. No. 5,600; Birdsall v. Coolidge, 93 U. S. 64, 23 L. Ed. 208; Walker, Pat. §§ 572, 573; Covert v. Sargent (C. C.) 42 Fed. 298. In the former case the court said:

"The terms 'profits' and 'damages,' as used in the act, are hardly convertible. They seem to mean different things. The latter are to be awarded 'in addition' to the former. Profits doubtless refer to what the defendant has earned by the unlawful use of the patented invention, and damages to what the complainant has lost. Before the act of 1870, it was incumbent on the patentee to make his election of remedies, and to proceed at law for the damages which he could show had been sustained from infringement, or in equity for the gains and profits that the defendant realized by the authorized use of his property."

In Covert v. Sargent (C. C.) 42 Fed. 298, the distinction was clearly recognized in this circuit. In that case the complainant recovered no damages, and the master found that he was entitled to the recovery of profits. The court said:

"As complainant has not recovered damages, he must be content with such indemnity for violation of his rights as he will receive by recovery of the profits which the master has found were realized by the defendant."

The master in the case at bar, in his report making the award, expressly states that no assessment against the defendants for damages for their infringement of the patent is made. The circuit court of appeals, on appeal from the master's report, states in its decision that the complainant shall "recover from the defendants the sum of $40,000,— their profits." The Kursheedt agreement contemplates no such payment, and, being asserted here in derogation of the rights of creditors, must be strictly construed. Moreover, the agreement empowers the issuance of licenses and payment of license fees, as well as damages for infringement to be paid to Kursheedt. I am unable to escape the conclusion that the true intendment of this contract was merely to obtain damages from past infringers, whenever such damages could be collected without resort to law, and possibly to induce, or aid in inducing, infringers to accept licenses for unexpired terms of the patent. Certainly, by its terms it fails to contemplate the recovery of gains and profits as the measure of damages in equity suits. The claim under the Kursheedt agreement is therefore disallowed. This conclusion renders it unnecessary to advert to any other reasons advanced for disallowing to complainant this one-quarter interest in the fund dependent thereon.

I am now brought to a consideration of the Lewis and Tillinghast claims. Their basis appears to rest upon facts and circumstances of

an extremely unusual as well as unsatisfactory **nature.** The intimation on argument by counsel for all parties that Stoughton, through whom both Lewis and Tillinghast claim title, was lacking in rectitude at the time of the transfer by him to Logan and Tuttle, predisposes the court to a faithful examination of the evidence. Therefore careful consideration is given to the testimony of Tuttle. The alleged corroborating circumstances are weighed and sifted with much caution, so as to insure an equitable solution of this controversy. The conclusion arrived at is that the testimony on the part of the claimants Lewis and Tillinghast has not removed a reasonable doubt which arises as to the sufficiency and cogency of the testimony offered to establish a verbal assignment of any recovery that might be had in the suit against Claflin. The facts upon which these claimants chiefly rely for their claim to equitable relief from this court show that Charles B. Stoughton was counsel in various patent litigations for the Elm City Company prior to its insolvency. He continued as such counsel in various patent suits after the appointment of Tuttle as trustee for creditors. Tuttle testified that Stoughton presented a bill to him for services rendered to the Elm City Company amounting to $5,000, and that thereupon he consulted with various creditors, and obtained their consent to satisfy the claim of Stoughton by assigning to him the Crosby & Kellogg patent, and the claim to recovery arising from the infringement. Subsequently this settlement is claimed to have been made, and Tuttle, at some time thereafter, which does not clearly appear, wrote upon one of his account books, as trustee of the estate, the words, "Sold to C. B. Stoughton for counsel fees." No assignment in writing of the patent or claim is relied on. Other facts appearing may be stated chronologically. The trustee commenced suit against Claflin et al. (Stoughton acting as his solicitor) July 10, 1878, nearly two years after his appointment. In 1879 Tuttle's accounts were allowed by the probate court. He charged himself with the sale for $606 of patents valued at $10,000, and credited himself with the loss of $9,394. No specific mention of the sale to Stoughton is made, nor does the account show any payment of Stoughton's claim for services, nor the receipt by him of any dividends on account thereof. The three-party agreement, wherein Stoughton is described as attorney, was made on June 16, 1883. On March 10, 1884, Judge Wallace, on final hearing, ordered a reference to a master for an accounting. October 30, 1884, Stoughton gave Mr. Logan, his associate counsel, a written assignment of all his interest and title in the claim and recoveries had. In the assignment, Stoughton declares that he is the owner of one-half of the claim by reason of an assignment to him from Tuttle. In November, 1886, Stoughton exhibited to cross claimant Lewis a pretended assignment, under date of November 2, 1886, of all claims for damages and profits that might be recovered. This instrument, it is conceded on all sides, was a forgery, and no claim is made thereunder. Lewis, having no knowledge of the Logan assignment, purchased half of Stoughton's interest, paying $2,500 therefor. At about this stage of the proceedings Stoughton disappeared, and has since died. Lewis on July 7, 1887,—nearly a year after the Stoughton assignment to him,—wrote to Tuttle, stating that he had an assignment of Stough-

ton's interest in the Claflin suit, and inquired whether there were any other conflicting interests. Tuttle replied that he had sold the patents to Stoughton previous to the ending of the suit. August 7, 1887, in reply to a letter from Lewis, he again wrote:

"I, as trustee, or any stockholder of said company, have no interest, as the patents in suit, when the affairs of the Elm City Company were settled, were sold to Mr. Charles B. Stoughton of New York."

And again, on October 14th of the same year, at Mr. Lewis' request, Tuttle signed a certificate stating that on or about November 2, 1878, he sold the patent and claim to Stoughton. Nine years had elapsed since the commencement of the suit against Claflin, when these letters were written, and five years had elapsed since the reference to the master for an accounting. On February 9, 1888, Logan and Lewis appeared personally and by counsel before the master, and attempted, by reason of the assignments, to control its procedure. Wooster contended before the master that by the three-party agreement he was in control. The master decided in favor of Wooster, although Logan continued in the case as associate counsel. On February 28, 1888, Tuttle again wrote Lewis. He stated that he had forgotten the three-party agreement, and that, inasmuch as his attention had been called thereto by Wooster, he felt bound to protect Wooster in the case. He further stated:

"Wooster said he will turn the one-half of the net proceeds over to me when the case is settled, and as it does not belong to me, and as proof can be shown whom it does belong to, I will turn it over to the right party."

Stoughton's appearances before the master ceased after June, 1885, and other counsel were employed by Wooster, who have been heretofor allowed compensation out of the fund. The master filed his report August 24, 1893, and found that the profits made by the defendants by way of infringement of the Crosby & Kellogg patent were $76,215.85. Judge Coxe overruled the master, and on appeal to the circuit court of appeals the award was fixed at $40,000,—the fund in court. Tuttle v. Claflin, 22 C. C. A. 138, 76 Fed. 227.

The contention on the part of the claimants Wooster and Trowbridge is that no title in this claim was ever in Stoughton,—in other words, that the trustee never made a verbal assignment to Stoughton, —and, further, that if such assignment was made it was invalid. The question whether a court of equity, in the exercise of its powers, should uphold the various mesne assignments through which Tillinghast and Lewis claim a lien on the fund, must be determined upon the weight of the evidence submitted in their support. Tuttle testified that he had made a verbal assignment to Stoughton of the patent and recovery. On his cross-examination of May 10, 1900, he testified that he made an affidavit in the Claflin suit on the 27th day of February, 1888, asserting that Stoughton on or about June 25, 1885, had abandoned the cause, departed from the district in which it was pending, and that his whereabouts were unknown. He reiterated at this time the truth of this affidavit taken in 1888, and testified further that his recollection of the facts in connection with this suit of Tuttle and Claflin was clearer in 1888, when the affidavit was made, than at the

time of the hearing. December 1, 1896, he again made affidavit in that case, in which he stated that after refreshing his recollection by referring to certain documents, papers, and records, he was convinced that he had never made any assignment to Stoughton, or to any one else, of the Crosby & Kellogg patent. He further testified as follows:

"Q. And did you not at the same time state, after examining those agreements, that you were inclined to think that Mr. Stoughton's lien upon the proceeds of the suit against Claflin & Co. was to extend only to services rendered in that suit? A. I presume I did. Q. That was true? A. I think so."

In 1897 another affidavit was made, contradicting the affidavit of December 1st. So that we find that this witness upon whose evidence claimants Lewis and Tillinghast are forced to rely has, during the progress of the litigation, made statements under oath of so contradictory a nature as to preclude the court from giving any credence to his testimony.

The foundation and stability of our jurisprudence depends upon the ascertainment of the truth in all controverted matters. Well-settled rules afford guidance in cases where the evidence of a witness is in hopeless conflict, and assuredly such is the case at bar. True, the transactions to which it relates occurred fully a score of years ago; and, while testimony of this nature may not be willfully false, yet it must be the subject of the severest scrutiny. Whether it be willfully false, or that of a forgetful, weak, or vacillatory man of 69 years, the standard of proof must be supplied which the law requires to satisfy the mind of the court, before relief can be granted. The burden of proof is upon the cross complainants to show, by competent and sufficient evidence, wherein the court, in the exercise of its beneficent equity powers, should raise its arm in their protection. No relief can be afforded by a court of equity in a case where the facts and circumstances forming a basis for the relief sought are left in a doubtful, confused, or uncertain state. Counsel for cross complainants earnestly contend that the proofs are not entirely dependent upon the evidence of Tuttle, but that corroborating circumstances and earmarks of truth to be found in the case are such that the court would be justified in believing the testimony of Tuttle given at a later date. It is insisted that the memorandum of the sale to Stoughton of the patent, made in the trustee's book of accounts, is strongly corroborative of his testimony. This memorandum, however, is without date, and Tuttle testified that he had no recollection as to when it was made. The inference fairly to be drawn is that it was not a contemporaneous entry. Although Stoughton received no dividend, the facts are not convincing that he was a creditor. His name does not appear in the list of creditors reported by the commissioner appointed by the probate court to decide upon claims. Other payments made by the trustee for legal services were reported and acted upon. Argument that at this time the assignment of the patents had been made, and that therefore it was deemed unnecessary to show the transaction on the books of the trustee, or make reference thereto in his account, is not convincing. The letters written by Tuttle to Lewis do not alter my conclusion. True, it is stated unequivocally in his first letter that he had sold the

patent and everything pertaining thereto to Stoughton. A fair interpretation of the language employed would include any recovery under such patent. He subsequently, again and again, in letters to Lewis, disclaimed any interest in the patent or recovery. Moreover, he never made any claim thereto, and, even after his execution of the ratifying agreement with Wooster, he deemed it necessary to disclaim ownership in any amount which might be recovered. This very properly may be regarded as a strong corroboration of cross claimants' contention. In the light of Tuttle's subsequent affidavits denying having made an assignment, however, I am still constrained to believe that the interest which Tuttle had in mind as the interest which Stoughton had at the time the letters were written was such lien or right in the recovery as a faithful counsel might legally have in the amount recovered by a client, due to his zeal and ability. It is not unlikely that Tuttle, acting as trustee, without means or authority from creditors to continue the Claflin litigation, continued the services of Stoughton with the understanding that a recovery subject to the Wooster agreement should inure to his benefit. Assuming this to be the fact, it would in no event accrue to the benefit of Lewis and Tillinghast, who hold simply under their assignment.

The result of all the evidence justifies the conclusion that Stoughton committed a wrong upon those to whom he assigned. The forged assignment hereinbefore alluded to is a circumstance strongly persuasive of the nonexistence of a verbal assignment, and of the theory advanced by complainant and Trowbridge. It is therefore quite unnecessary to further consider at length the alleged corroborative evidence, since it is insufficient for that purpose without better evidence, in support of which it might be offered. Such testimony cannot receive approval on the ground that contradictory statements were erroneously made, in good faith, through lack of memory. The transaction itself under which Lewis and Tillinghast claim title is interwoven with obscurity. No adequate reliance can be placed on the honesty of Stoughton, from whom they claim.

The record discloses that legal services were performed in the Claflin suit by Stoughton prior to his abandonment thereof. No claim, however, is here made on behalf of those who claim under Stoughton to recover on an adequate lien created for legal services rendered. The right of Lewis and Tillinghast to recover depends upon a claim of a verbal assignment by Tuttle to Stoughton of profits in the Claflin suit, and, no such assignment having been found by the court to have been made, it is unnecessary to consider any claim to the fund which Stoughton's representatives may have for such services performed.

It is insisted by counsel for the trustee that the division of gross proceeds provided for by the three-party agreement, as subsequently modified, precludes an equal division of the fund between Wooster and the trustee, and that payments of counsel and solicitor's fees dependent upon a contingent amount recoverable were not expenditures for which Wooster became liable. The circuit court of appeals, when the appeal granting allowances to counsel, and directing payment to Wooster for expenses incurred, was before it, decided that Wooster

had authority, pursuant to the contracts with Tuttle, to employ solicitors and counsel. I think that a fair and reasonable interpretation of the terms of the contract requires me to hold that the payment of the sums of money paid to counsel pursuant to direction of the circuit court of appeals was an expenditure chargeable to the fund, and not Wooster, and therefore the trustee must bear an equal share.

Finally, it follows from the foregoing that cross claimants Lewis and Tillinghast are not equitably entitled to have any sum whatever by reason of the pretended verbal assignment to Stoughton from the trustee of the Elm City Company; that, out of the fund now in the custody of the court, Emma C. Wooster, complainant, shall have and receive one-half of an entire fund amounting to $24,063.41, with accrued interest; the remaining half, together with accrued interest, shall be paid to Charles H. Trowbridge, trustee of the Elm City Company, with accrued interest. No costs are allowed against cross claimants Lewis and Tillinghast. The costs and disbursements of Wooster and Trowbridge, trustee, to be paid out of the fund.