## Eyster v. Centennial Board of Finance.

In the distribution of the moneys remaining in the treasury of the Centennial Board of Finance at the close of that corporation, as provided for in sect. 10 of the act of Congress of June 1, 1872 (17 Stat. 203), the appropriation of $1,500,000, made by the act of Feb. 16, 1876 (19 id. 3), must be paid into the treasury of the United States before any division of assets is made among the stockholders in satisfaction and discharge of the capital stock.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

The facts are stated in the opinion of the court.

*Mr. Assistant Attorney-General Smith* and *Mr. William M. Springer* for the appellant.

*Mr. William Henry Rawle* and *Mr. Robert N. Willson, contra.*

Mr. Chief Justice Waite delivered the opinion of the court.

This case presents the single question whether, in the distribution of the moneys remaining in the treasury of the Centennial Board of Finance at the close of the affairs of that corporation, as provided for in sect. 10 of the act of June 1, 1872, the appropriation of $1,500,000 made by Congress in the act of Feb. 16, 1876, must be paid into the treasury of the United States before any division of assets is made among the stockholders in satisfaction and discharge of the capital stock.

It is very apparent that the object of Congress, in all its legislation with reference to the Centennial Exhibition, was to enable the people of the United States to commemorate " the completion of the first century of their national existence " by an exhibition " in which the people of the whole country should participate," and which should have the sanction of the government. In that sense, the object was national; but it is equally clear, that, until the act of 1876, it was expected that the entire expense would be borne by the people without assistance from Congress. Certainly, no pecuniary liability whatever was assumed by Congress. That is declared in the most positive terms.

The acts of 1871 and 1872 did nothing more than provide the necessary organizations through which the people might

operate under the auspices of the government.   That of 1871 authorized the appointment of the board of commissioners, which was afterwards, by the act of 1872, incorporated as the "United States Centennial Commission."   The duty of this board was to prepare and superintend the execution of a plan for holding the exhibition.   That of 1872 was specially intended to provide a way by which the people could procure the necessary funds.   It was so expressly declared in the preamble ; and for that purpose the Centennial Board of Finance was incorporated, with apt provisions for subscription to and sale of its capital stock, and for the control and management of its affairs. The proceeds of the stock, together with the receipts from all other sources, were to be used by this corporation for the erection of buildings with their appurtenances, and for all other expenditures required in carrying out the objects of the act of 1871.   Then, by sect. 10, it was provided, "that, as soon as practicable after the said exhibition shall have been closed, it shall be the duty of said corporation to convert its property into cash, and, after the payment of its liabilities, to divide its remaining assets among its stockholders, *pro rata*, in full satisfaction and discharge of its capital stock."

Afterward came the act of 1876, which made the appropriation now under consideration, "to complete the . . . buildings and other preparations," and directed its payment to the president and treasurer of the Centennial Board of Finance for that purpose, but which contained a proviso, "that in the distribution of any moneys that may remain in the treasury of the Centennial Board of Finance after the payment of its debts, as provided for by the tenth section of the act of Congress approved June 1, 1872, incorporating the Centennial Board of Finance, the appropriation hereinbefore made shall be paid in full into the treasury of the United States before any dividend or percentage of profits shall be paid to the holders of said stock;" and "that the government of the United States shall not, under any circumstances, be liable for any debt or obligation of the United States Centennial Commission or the Centennial Board of Finance, or any payment in addition to the foregoing sum."

The whole controversy arises upon this proviso.   On the one

hand, it is contended that it requires the repayment to the United States of the full amount of their appropriation before any distribution can be made to the stockholders; and, on the other, that the stockholders must be reimbursed for their stock subscriptions before any payment is made to the United States. It becomes necessary, therefore, to ascertain the intention of Congress in this particular, and for that purpose the acts of 1871, 1872, and 1876, being *in pari materia,* are to be examined and construed together.

There is no doubt but that the act of 1876 appropriated public moneys for the completion of the centennial buildings and other preparations. Neither is there any doubt that, under certain circumstances, the Centennial Board of Finance was required to pay back to the treasury of the United States the full amount of the appropriation. The corporation assumed such an obligation by taking the money upon the conditions imposed. If this did not create a debt, technically so called, it certainly did create a liability. The act of 1872 provided for a division of the assets of the corporation among the stockholders, only after the payment of all liabilities; and, unless the contract entered into otherwise directs, it would seem to be clear, that, so far as that act is concerned, the United States must be paid in full before the stockholders can claim any distribution among themselves.

In the act of 1876, the language is somewhat different. By that the United States are to be paid out of the moneys that remain in the treasury of the company, after the payment of the debts. If this were all, the intention would be manifest. The liability of a corporation to its stockholders on account of their stock is not a debt. The shares of a stockholder represent his proportion of the property of a corporation; and, upon the winding up of its affairs, the assets remaining after all liabilities are discharged are for division among the stockholders, according to their respective interests. The payment to stockholders upon such a division is for a dividend of the property divided, not for a debt owing by the corporation. The United States, then, even under this act, are entitled to a preference over the stockholders, unless the words "before any dividend or percentage of profits shall be paid to the holders of such

stock " change the condition of the parties.   This will depend much upon the signification of the term " profits " as here used.

In construing statutes, some effect should, if possible, be given to every word employed to express the legislative will. Nothing should be rejected, if it can be avoided ; and nothing can be added, except by implication from what is expressed. As in the act of 1872 stockholders are not to be paid any thing until all liabilities are discharged, and in that of 1876 the United States are to be reimbursed before any profits can be divided; and no provision is made for the redemption of capital stock, except upon a division of the profits, it is apparent that, if such a redemption is to be made before the liability of the United States is satisfied, something must be supplied in the statute, by implication, that has been apparently omitted. The presumption is, however, that every thing has been expressed which was intended ; and, if an effect can properly be given to the word " profits " that will harmonize the two statutes, without a resort to implication, it should be done.

The capital stock of this corporation was not employed in, but to prepare for, the business of the contemplated exhibition ; and the receipts of the exhibition, over and above its current expenses, are the profits of the business.   These were the only profits anticipated.   They are, in fact, the net receipts, which, according to the common understanding, ordinarily represent the profits of a business.   The public, when referring to the profits of the business of a merchant, rarely ever take into account the depreciation of the buildings in which the business is carried on, notwithstanding they may have been erected out of the capital invested.   Popularly speaking, the net receipts of a business are its profits.   So here, as the business to be carried on was that of an exhibition, and its profits were to be derived only from its receipts, to the popular mind the net receipts would represent the net profits.

Giving that signification to the word in this case, we encounter no difficulties.   The statutes are complete, and there is nothing to supply.   Every thing is in harmony, and no strained construction is required.   All accounts are easily adjusted, without resort to unusual proceedings.

When a corporation is to be wound up, there is not, ordina-

rily, a necessity for an account of profits.  After the liabilities
are paid, the remaining assets belong to the stockholders, and
all that need be done is to make the proper division.  For
that purpose, it is quite immaterial whether what remains is
profit or capital.  In either case, it belongs to the stockholders,
and is to be distributed among them *pro rata.*  Such a division
produces a dividend, — that is to say, a part or share of the
thing divided.  If the division is of profits, then the dividend
is of profits ; if of capital, then of capital.  The dividends de-
clared by a corporation in business usually are, and, except
under special circumstances, always should be, from profits.
Hence, the word frequently carries with it the idea of a division
of profits ; but that is not necessarily its only meaning.  Its
special signification, in any particular case, is always dependent
upon the character of the thing divided.

By the act of 1872, the assets were to be reduced to cash,
liabilities paid, and the remainder divided among stockholders.
The words " in satisfaction and discharge of its capital stock "
add nothing to, and take nothing from, what precedes; and
the whole of that part of sect. 10, taken together, provides for
nothing more than what would have been done without it.  If
there had not been a word upon the subject, the law would
have disposed of the property in precisely the same way, and
the stockholders could have compelled a settlement upon that
basis.

The act of 1876 requires the payment of debts, and then the
reimbursement of the United States before a distribution of
profits to stockholders.  Not a word is said about restoring cap-
ital : in fact, there is no mention of capital at all.  The act of
1872 is not repealed.  On the contrary, it is left in full force
in every particular, save that the new liability incurred to the
United States is made payable after those contemplated by the
act of 1872 are satisfied in full.  In this, the United States
made a concession to creditors, but not to the stockholders.
Neither was any thing taken from stockholders : they retain
all the rights which the act of 1872 gave them.  If there had
been no appropriation by Congress, the corporation would
have been driven to the necessity of raising the required means,
by borrowing or a further sale of stock.  If by borrowing, the

debt so created would have to be paid with the others, before there could be any dividend to stockholders. If by sale of stock, the new stockholders would come in *pro rata* with the old upon the final division of the assets.

Congress might have advanced the money by loan as well as upon the conditions it did impose. It might also have subscribed to the stock. If a loan had been made, and there had been no waiver of the legal rights of the government as a creditor, this debt would have preference over all others in the order of payment. If stock had been taken, the government would have participated in the final distribution like any other stockholder. It seemed best, however, not to adopt either of these plans, and another was devised, by which creditors were given a preference, and the United States remitted for their indemnity to the fund which might remain after all the debts were paid. To this the corporation assented, and the stock holders cannot now complain. Creditors were protected, and stockholders not injured.

We think, therefore, that Congress did not intend, by the act of 1876, to change the order of distribution as provided by that of 1872, except by giving a preference to other liabilities over that to the United States, and that the word "profits" was used in 1876 to represent the net receipts of the business of the exhibition to be had in the buildings erected and upon the grounds prepared for its accommodation by means of the capital of the Centennial Board of Finance. In this way " profits," in the act of 1876, and " remaining assets," in that of 1872, have substantially the same meaning; and the two statutes are relieved from all discrepancies, without doing violence to the language of either.

If the impaired capital is made good out of the profits, it will be for the purposes of distribution only. Indirectly, there-fore, a division of the capital unimpaired would operate as a dividend of profits, because, before the stockholders could be paid in full the receipts of the business must be applied to supply the deficiency arising from depreciation. Such a dividend is prohibited.

The decree of the Circuit Court must be reversed, and the cause remanded, with instructions to enter a decree directing

the payment of the sum of $1,500,000 into the treasury of the United States by the Centennial Board of Finance before any division of the remaining assets of that corporation is made among the stockholders, and it is *So ordered.*

MR. JUSTICE STRONG dissented.