THE CITY OF ERIE V. THE ERIE GAS & MINERAL COMPANY.

No. 15,592.   (97 Pac. 468.)

SYLLABUS BY THE COURT.

NET PROFITS—*Computation and Division—Agreement between City and Gas Company—Sale of · Gas for "Domestic Purposes."* In consideration of the franchise and the transfer of certain leases, wells and city bonds the defendant company agreed to pay to the city, annually, one-fifth of the actual net profits derived from the sale of gas to the inhabitants of Erie for domestic purposes. In a suit for an accounting and recovery of such profits it is *held:* (1) That the company, with the aid contributed by the city, was to create and own the necessary instrumentalities for producing and distributing gas, in which the city has no proprietary interest and in the cost of which it has no voice or concern. (2) In computing the profits to be divided the expenditures of the company for these instrumentalities can not be charged as expenses against its receipts from the sale of gas. Such expenditures constituted the company's contribution to the plant with which it was to produce and distribute the product. (3) The cost of operating the plant in furnishing gas within the city upon which profits are to be divided, including necessary repairs, should be charged as expenses, to be deducted from the amount received for such gas, in order to determine the profits thereon. Such expenses will not include expenditures for new wells, mains or other permanent improvements or betterments; nor the cost of supplying gas and making other sales in the profits of which the city does not share. (4) "Domestic purposes," as the term is here used, includes gas furnished for homes, churches, stores, offices, and the opera-house, where its principal use is for heating and lighting, and not for power.

Error from Neosho district court; LEANDER STILLWELL, judge. Opinion filed June 6, 1908. Reversed.

*Hugh P. Farrelly, Thomas R. Evans,* and *Fred F. Groelle,* for plaintiff in error.

*W. R. Cline,* and *J. Q. Stratton,* for defendant in error.

The opinion of the court was delivered by

BENSON, J.: The city of Erie voted $5000 in bonds to prospect for, and to secure a supply of, natural gas, and used $2700 of the amount in such ˙undertaking. Its success was only partial. About the same time the defendant, the Erie Gas & Mineral Company, was engaged in mining for, and selling, natural gas in the same vicinity, and had made some progress and secured some gas. In this situation, on the 24th of August, 1900, the parties entered into a contract incorporated into an ordinance of the city, whereby the city agreed to turn over to the company its gas-wells and leases and $2000 in city bonds and the company agreed to furnish gas for the city and its inhabitants. For that purpose the company was granted the right to lay its mains and pipes in the streets. The contract, among other provisions, contains the following:

"Said party of the first part further covenants and agrees to pay annually, on or before the first day of August of each year, to the said The City of Erie, one-fifth of the actual net profits of the said The Erie Gas & Mineral Company, derived from the sale of gas to the inhabitants of the said city for domestic purposes, for the fiscal year ending June 30."

The city turned over to the company with the bonds a lease on six acres of land, and one gas-well furnishing a small supply; also, another well drilled to the first gas-sand, which the company completed at its own expense. Both wells are still used, but these, together with the two wells it already owned, were insufficient, and the company has since diligently endeavored, by drilling many new wells and improving the old ones, to furnish a supply of gas, and has been reasonably successful in this effort, although the gas-field appears to be a poor one.

The company commenced to furnish gas under the agreement above recited in November, 1900, but ren-

dered no account of profits to the city and made no payments thereon, and this suit was brought January 4, 1906, for an accounting of such profits, and to recover one-fifth thereof. The answer denied that any profits had been made. The trial was to the court, resulting in a general finding for the defendant.

The plaintiff alleges several errors, but the one principally relied upon is the conclusion that before being chargeable with profits the company should be allowed its entire outlay in providing its plant, which includes its wells, mains, pipes, and equipment, by means of which it supplies its patrons, and that no profits could be considered as earned until the company was reimbursed for these expenditures. From the opinion of the learned judge it appears that this was the theory adopted by the court, and that the cost of providing the wells and the necessary pipes and appliances was allowed as expense, without taking into consideration the value of these instrumentalities constituting the plant.

"Net profits" have been defined as "the gain that accrues on the investment, after deducting the losses and expenses of the business." (2 Bouv. Law Dic. 486. See, also, *Tutt v. Land*, 50 Ga. 339; *Connolly v. Davidson et al.*, 15 Minn. 519, 2 Am. Rep. 154.) In the case of *Eyster v. Centennial Board of Finance*, 94 U. S. 500, 24 L. Ed. 188, involving the distribution of the remaining funds of the Centennial Exposition Company, it was said:

"The capital stock of this corporation was not employed in, but to prepare for, the business of the contemplated exhibition; and the receipts of the exhibition, over and above its current expenses, are the profits of the business. These were the only profits anticipated. They are, in fact, the net receipts, which, according to the common understanding, ordinarily represent the profits of a business. . . . Popularly speaking, the net receipts of a business are its profits. So here, as the business to be carried on was that of an

exhibition, and its profits were to be derived only from its receipts, to the popular mind the net receipts would represent the net profits." (Page 503.)

The import of the term "net earnings" was considered in the leading case of *Union Pacific R. R. Co. v. United States*, 99 U. S. 402, 25 L. Ed. 274, where it was said:

"Having considered the question of receipts or earnings, the next thing in order is the expenditures which are properly chargeable against the gross earning in order to arrive at the 'net earnings,' as this expression is to be understood within the meaning of the act. As a general proposition, net earnings are the excess of the gross earnings over the expenditures defrayed in producing them, aside from, and exclusive of, the expenditure of capital laid out in constructing and equipping the works themselves. It may often be difficult to draw a precise line between expenditures for construction and the ordinary expenses incident to operating and maintaining the road and works of a railroad company. Theoretically, the expenses chargeable to earnings include the general expenses of keeping up the organization of the company, and all expenses incurred in operating the works and keeping them in good condition and repair; whilst expenses chargeable to capital include those which are incurred in the original construction of the works." (Page 420.)

It is true that net earnings are not always net profits, for there may be some incidental deductions to be made from net earnings before profits are realized, but the principle of this decision is believed to be quite applicable to the case under consideration. In estimating the gains of any business, if we take into consideration the cost of the original investment in the plant or factory we must also consider the value of the establishment remaining. The application of the theory adopted by the court charged the city, in effect, with the cost of the investment, but gave no credit for its value. In an action to recover an alleged excessive income tax upon net income it was held:

"The object of the law was to impose a tax on net

income, or profits, only; and that can not be regarded as net income, or profits, which is required and expended to keep the property up in its usual condition proper for operation. Such expenditure is properly classed with repairs, which are a part of the current expenses. If a railroad company should make a second track when they had but a single track before, this would be a betterment or permanent improvement, and, if paid out of the earnings, would be fairly characterized as 'profits used in construction.' The works of the company would have an additional value to what they had before, with an increased capacity for producing future profits." (*Grant v. Hartford & N. H. R. R. Co.*, 93 U. S. 225, 227, 23 L. Ed. 878.)

In *Mayer v. Nethersole*, 71 N. Y. Supr. Ct., App. Div., 383, this subject was considered in the interpretation of a contract between an actress and her manager, wherein he was to receive a certain percentage of her profits in proposed theatrical tours. The court said:

"The controversy is over the meaning of the word 'profits,' the appellant contending that the cost of 'production,' which includes scenery, costumes, properties and other expenses in preparing for the commencement of the theatrical season, as well as running expenses, including salaries, railroad fares, royalties, advertising, etc., must be deducted before there are any profits, and the respondent insists that the cost of 'production' should not be deducted." (Page 385.)

The referee in that case held that this cost of production was a part of the appellant's permanent capital, invested not merely for the two seasons but for the future, the property being and remaining hers, and that therefore the cost should not be deducted in determining the amount of profits. On exceptions to this decision of the referee the court said:

"In manufacture, agriculture and ordinary business the word 'profit' ordinarily means the excess of returns over expenditures and may or may not, according to circumstances, include in the returns any increase in value of the capital and in the expenditures

any depreciation of capital. In a more scientific sense it relates to that excess which remains after deducting from the returns not only the operating expenses and depreciation of capital, but also interest on the capital employed. The appellant could not be heard to say that she intended in her offer to use the word 'profits' in a technical or scientific sense, for the respondent presumably accepted it according to its ordinary meaning. She seeks to attach to it a special meaning different from the sense in which it is ordinarily used in the business world. She includes among the expenditures the cost of production, which is the money embarked in the venture at the outset; but she takes no account of the assets at the expiration of the contract." (Page 388.)

At the beginning of this venture the city transferred its two wells and its leases, delivered its bonds to the amount of $2000, and granted the use of its streets to the company, thus contributing that much toward the investment necessary to launch the enterprise. The company was to furnish whatever else might be necessary for that purpose, and was to own and operate the plant. The annual profits were to be divided, one-fifth to be paid to the city and the remaining four-fifths to be retained by the company. It can not be supposed that in computing these profits the expenditures of the company in creating the establishment were to be charged as expenses against its receipts, for such expenditures constituted its own contribution to the enterprise. The company engaged to furnish a supply of gas to the people of the city, as stated in the agreement. Incident to this supply, it must be held that the company undertook, aided by the contribution of the city, to furnish the necessary instrumentalities for producing and distributing this supply. These instrumentalities included all necessary wells, trenches, pipes, mains and appliances constituting its plant, estimated at the trial to be worth $60,000. In this the city has no proprietary interest, and no voice or concern as to its

23—78 KAN.

cost. The cost of operation in furnishing gas within the city, upon which profits are to be divided, including necessary repairs, must be charged as expenses, to be deducted from the amount received therefor, in order to determine the profits thereon. Such expenses, however, will not include expenditures for new wells, mains or other permanent improvements or betterments, nor the cost of supplying gas and making sales in the profits or which the city does not share.

It is suggested that it will be difficult to distinguish these items. The receipts and expenditures of the company have not been classified, but are entered in one common account, including the cost of the establishment, the operation of the service, and matters pertaining to sales within and without the city; but this difficulty can not affect the rights of the plaintiff, and probably will not be found to be as great as anticipated.

In presenting its estimates for the computation of profits counsel for the plaintiff deduct from the amount of sales within the city the amount received from sales to manufacturers. The defendant now contends that there should also be a reduction for gas sold to churches, the opera-house, stores, and offices—that these are not "domestic purposes." The term was probably used with reference to the ordinary distinction usually made in the sale of gas for light and heat for the comfort and convenience of individuals in their homes, offices, stores, churches and the like, and sales made to manufacturers to generate power. Usually, reductions are made for the latter purpose from the schedule of prices for the former. The term "domestic" has a widely varying meaning, and, while its primary significance relates to the house or home, it is often used in a vastly broader sense. Its significance must always be determined with reference to the subject-matter and the relation in which it appears. In this contract, and with reference to this subject, the more reasonable view is that it applies not only to the homes.

of the city but to other places named where its principal use is for heating and lighting, and not for power. It appears that the parties construed the term to exclude only manufacturing purposes. The secretary and manager of the company, after stating as a witness the amount of sales for all purposes, and deducting the amount of sales for manufacturing purposes in the city, and giving the balance, was asked:

"Ques. Does that sum represent the proceeds for sale of gas sold to the inhabitants of the city for domestic purposes, from the time the first gas was furnished in November of 1900 up to the last of December, 1905? Ans. Yes, sir; as I understand it."

It is not necessary to consider the alleged errors in ruling upon testimony. These rulings were fairly incidental to the mistaken theory upon which the judgment rests, i. e., that the company might treat its entire outlay in creating the plant as expense of operation. Because of this error the judgment is reversed, and a new trial ordered.