## INTERNATIONAL RADIO TELEGRAPH CO. v. ATLANTIC COMMUNICATION CO. (two cases).

## MARCONI WIRELESS TELEGRAPH CO. v. SAME.

(Circuit Court of Appeals, Second Circuit. May 14, 1923.)

Nos. 182–184.

**1. Patents ⊚⇒287—Only profits received by infringer can be recovered.**

In a suit for infringement of a patent, where damages are not claimed by plaintiff, the plaintiff can recover only profits which the defendant has realized, not those which have been realized by others.

**2. Equity ⊚⇒63—Patents ⊚⇒287—Profits of all infringers cannot be recovered by seizing property of one.**

Equity acts in personam, not in rem, and there is no process or procedure in a suit for infringement of patent whereby the profits of all infringers can be seized by taking the property of one.

**3. Patents ⊚⇒318(3)—"Profit" defined; "payments."**

Though "profit" is a somewhat elastic word, it is defined in a case of patent accounting as the gain made upon any business or investment when both the receipts and payments are taken into account; and by "payments" are meant the lawful payments.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Payment; Profit.]

**4. Corporations ⊚⇒378—Equities against controlled corporation are worked out through rights of minority stockholders.**

The equities of outsiders against a corporation which is controlled by another corporation are worked out through the rights of minority stockholders of the controlled corporation.

**5. Corporations ⊚⇒378—Validity of agreement with controlled corporation depends on fairness.**

The validity of an agreement made between two corporations, one of which owned a controlling interest in the other, depends upon whether the proposition submitted to the controlled corporation would have commended itself to an independent corporation.

**6. Corporations ⊚⇒378—Patents ⊚⇒287—Traffic agreement by infringer with controlling corporation held valid.**

A traffic agreement between a domestic corporation engaged in the transmission of wireless messages and a German corporation, which owned the controlling interest in the domestic company, entered into at the outbreak of the World War when the transmission of messages overseas was not a commercial proposition and the communication from shore to vessels had proved unremunerative, whereby the controlling corporation was entitled to a portion of the receipts of the other and in turn guaranteed an income to the other, was fair and valid so that the domestic company's profits from the infringement of wireless patents were limited to the percentages retained by it.

**7. Patents ⊚⇒287—Joint infringers are jointly and severally liable for all damages.**

Joint infringers are at law jointly and severally liable for whatever damages the owner of the patents is able to show.

**8. Patents ⊚⇒287—Parties conspiring to infringe are not liable for profits made by all.**

If two or more parties conspire to profit by an infringement of patents, each conspirator does not thereby become liable for the profits made by all the conspirators.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. **Patents** ☞312(3)—**Evidence held to sustain master's findings apportioning profits among owners of several patents.**

In separate suits for infringement of three patents owned by two different corporations, evidence *held* to sustain a master's findings apportioning the profits defendant realized by the infringement among the several owners.

Appeals from the District Court of the United States for the Southern District of New York.

Two suits in equity by the International Radio Telegraph Company against the Atlantic Communication Company, with a suit by the Marconi Wireless Telegraph Company against the Atlantic Communication Company, for infringement of a patent. From final decrees ascertaining the profits realized by defendant, defendant appeals in each case. Reversed and remanded, with directions.

Appeals from final decrees in equity entered in the District Court for the Southern District of New York.

The appellant seeks to review the action of the court below in respect of the findings of a master (Hon. E. Henry Lacombe) before whom the accountings ordered proceeded simultaneously. All testimony was considered applicable to each case; three causes were heard as if after interlocutory decree they had been consolidated. .

All these suits begin with the usual patent bill against Atlantic Communication Company (hereinafter called "Atlantic") as sole defendant. This concern is a corporation of the state of New York.

So far as the decisions on the merits resulting in decree declaring infringement and ordering an accounting are reported, they are found in Marconi, etc., v. DeForest (D. C.) 236 Fed. 942, affirmed 243 Fed. 560, 156 C. C. A. 258; Kintner v. Atlantic Communication Co. (D. C.) 241 Fed. 946; and Kintner v. Atlantic et al. (D. C.) 249 Fed. 73.

The patents are all concerned with the art of radio communication. The suit of the Marconi Company seeks to recover for the infringement of the so-called "Fleming valve" as used in receiving wireless signals. The suits of the International Company rest upon the Fessenden patents for heterodyne reception and continuous wave transmission of wireless signals.

Plaintiffs never claimed any damages; it stands admitted that they suffered none. In each suit plaintiff's effort is to recover its proper share of the profits made by defendant through and by reason of the infringing use of the patented devices hereinabove referred to.

The accounting period is from August 1, 1914, or substantially the date of outbreak of the World War, to April 6, 1917; i. e., the date that the United States declared war upon Germany.

Further it is agreed that the only source of profits was the reception and/or transmission of transoceanic radio messages between Atlantic's station at Sayville, Long Island, and the station at or near Nauen, Germany, of a corporation of that country, which throughout this litigation is called the "Telefunken."

It is also undoubted, or overwhelmingly proven, that Atlantic was incorporated in or about 1912; that it was at all times controlled in its corporate action by Telefunken through stock ownership; but whether by direct ownership of stock or through ownership by persons whose principal interests were in and with Telefunken does not clearly appear and seems immaterial. Plainly, however, Atlantic could at all times be relied upon to act as Telefunken desired, whether such action was taken at a stockholders' meeting or by the directors. There was a small minority of the stock, however, bought and paid for by American citizens, who doubtless sympathized with Telefunken's object, but are not shown to have had any financial interest in the controlling corporation.

The evidence indicates that Telefunken was engaged prior to the outbreak of war in seeking to establish a reliable system of commercial radio trans-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

mission of messages over long distances, and particularly over the seas. Atlantic was formed and the Sayville station established with that ultimate end in view, but prior to the middle of 1914 transoceanic transmission had apparently not emerged from the experimental stage and was certainly not commercially used.

Prior to that time Atlantic was not equipped even to attempt such long distance service; it procured all its essential radio apparatus from Telefunken; so far as shown by this record the instruments or apparatus in the Sayville plant which have been decreed to infringe the United States patents in suit were themselves made in Germany.

Almost at once after August 1, 1914, cable communication with Germany ceased, and Atlantic was encouraged by Telefunken to attempt the maintenance of commercial communication across the ocean. Before that time it had been restricted (apparently by the form of its licenses) to ship and shore communication. It was in this new enterprise of transoceanic message sending and receiving that the infringements complained of occurred and the profits sought for acquired.

Again it is fully proven that substantially contemporaneously with this new enterprise of Atlantic's, a contract was made between that company and Telefunken executed with due formality in and by which Atlantic was guaranteed by Telefunken an income of $100,000 a year whether business was good or bad. In addition to this, Atlantic was to receive 25 per cent. of the "telegraph tolls due to Sayville" up to total receipts of $48,000. As to amounts received over $48,000 Atlantic's share was to be 12½ per cent.

The existence of this contract and its formal execution is fully proven. We find it also proven that Atlantic lived up to it as far as conditions of interrupted communication permitted, and actually remitted to Telefunken as payments under this contractual arrangement between October, 1915, and December, 1916, nearly $300,000.

The receipts of the Sayville station were very large and continued to be collected by Atlantic even after the spring of 1915, when, owing to complaints of neutrality infringement, the Secretary of the Navy established what was in effect a managing censorship at Sayville and permitted only such messages to be sent as his representatives in charge thought proper.

This condition of affairs lasted until declaration of war by the United States, when not only the station at Sayville but the stock of Atlantic, and therefore its corporate management, was taken over by the representatives of the United States (ultimately) under the provisions of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j); it never having been denied that Atlantic was the kind of German-controlled corporation open to the operation of that law.

It does not appear clearly whether the German-owned stock of Atlantic has been sold under the provisions of the statute, but it is plain that the American control of Atlantic is or was at the time of hearings before the master solely concerned with liquidating the assets of Atlantic, which assets include such matters as ship radio equipment having no proved relation to the infringing business out of which profits claimed arose.

The record presents two questions: (1) The validity and effect of the contract between Telefunken and Atlantic of August, 1914; and (2) the proper ascertainment and apportionment of such profits as are discoverable between the various patentees who are plaintiffs in these suits.

The master held the contract (known as the traffic agreement) valid, ascertained the profits in accordance therewith, appropriated all of the profits so found to the use of the plaintiffs, and awarded them, 75 per cent. to the plaintiff International Company, and 25 per cent. to Marconi.

On exceptions the District Court held the traffic agreement invalid; the result whereof was to declare as Atlantic's profits very large sums of money, as to the disposition of which Telefunken and Atlantic had agreed before they were earned and of which (semble) a very large part had been actually transmitted to Germany and Telefunken as above set forth. The District Court also distributed the resulting enlargement of profits.

From the three decrees accordingly defendant appealed, and the appeals have been heard on one record.

Dean S. Edmonds, Ramsay Hoguet, and Schuyler M. Meyer, all of New York City, for appellant.

James R. Sheffield, of New York City, for appellee Marconi Co.

Frederick W. Winter, of Pittsburgh, Pa. (Drury W. Cooper, of New York City, of counsel), for appellee International Radio Telegraph Co.

W. Clyde Jones, of New York City, by permission of court filed a brief as amicus curiæ on the subject of proper apportionment of profits in patent causes.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The fundamental question is this: As the profits in question accrued or arose, to whom did they legally belong?

[1] It has never been doubted in patent litigation that where damages are not claimed the plaintiff "must be content with such indemnity for the violation of his rights as he will receive by recovery of the profits which the master has found were realized by the defendant" (per Wallace, J., Covert v. Sargent [C. C.] 42 Fed. 298; Wooster v. Trowbridge [C. C.] 115 Fed. 722, at page 728).

That is, what the plaintiff can recover must have been realized by defendant; they must be his profits, and not those of another.

[2] Equity acts in personam, not in rem; it is impossible, under or by any process or procedure exhibited in this litigation, to seize the profits of all infringers by taking the property of one. The point is emphasized in Elwood v. Christy, 18 C. B. (N. S.) 494, by declaring that a master should "take an account of the profits which have been actually made by the defendants."

[3] "Profit" is undoubtedly a somewhat elastic word; "popularly it is the net receipts of a business" (per Waite, C. J., Eyster v. Centennial Board, 94 U. S. 503, 24 L. Ed. 188); and when it comes to properly declaring dividends the word denotes "what remains after defraying every expense, including loans falling due as well as the interest" thereon. Mobile, etc., Co. v. Tenn., 153 U. S. 497, 14 Sup. Ct. 971, 38 L. Ed. 793. In a case of patent accounting it has been held that "'Profit' is the gain made upon any business or investment, when both the receipts and payments are taken into the account." Rubber Co. v. Goodyear, 9 Wall, 788, at page 804, 19 L. Ed. 566. Payments are of course lawful payments.

[4] This brings us to consideration of the legality, i. e. validity of the traffic agreement. The relation between a controlled and controlling corporation is sufficiently and instructively set out in Noyes on Intercorporate Relations (2d Ed.) § 300. The controlling corporation assumes a trust relation to the minority shareholders of the corporation controlled. That is, it is through the right of the minority shareholders of the controlled corporation that the equities of the rest of the world are worked out.

The decisions relied on by plaintiff are fairly illustrated by Rubber Co. v. Goodyear, supra, and Bush v. Becker, 234 Fed. 79, 148 C. C. A. 95; where, in respect of accounting for profits derived from infringements, the courts refused to permit as proper expenses in dimi-

nution of profits exorbitant salaries paid to officials of the infringing defendants. Undoubtedly items of expenses may be looked into; the bald fact of payment by an infringing defendant under the title of expense is not enough.

[5] Thus to the legal rule stated by the learned master we give adherence, viz:

"A fair way to determine the question (of validity of traffic contract) is to consider whether the proposition submitted would have commended itself to an independent corporation. If to such a corporation the proposition would not have seemed unfair or unconscionable, a court should not be inclined to condemn the agreement merely because one party to it controlled the other."

[6] We now observe that as late as 1914, the enterprise of transoceanic radio-communication was in rather an unpromising infancy; the ship-to-shore business of Atlantic had been confessedly unprofitable, and that company was dependent upon Telefunken not only for capital but for technical supplies; its issued share capital was small, and when it was offered an annual guaranty deemed sufficient to pay expense of operation and a share of the profits which (if there ever were any profits worthy the name) would give a substantial dividend upon its capital stock, it seems to us, as to the master, that any reasonable body of men would have been glad of so secure a position in respect of a business confessedly experimental. For these reasons we hold that the traffic agreement of August, 1914, was a reasonable, lawful, valid, and indeed desirable business arrangement entered into before any of the profits sought to be reached in this case were either received or anticipated with any degree of certainty.

The attack on the agreement is substantially (though not put quite so strongly) that it was begotten and conceived in fraud. "Fraud" is a large word; and as applied to this case it can only mean that the German Telefunken, secure from the processes of this and other American courts by its remoteness, deliberately arranged in this traffic contract a scheme by which its creature Atlantic would do the work that resulted in profits, and yet by this agreement secure the major portion thereof for itself; even in the face of gross and intended infringement by its servant. As to this suggested deep-laid scheme of fraud, we hold (by quotation from the master's report) that we are "not persuaded either by the proofs or the argument that the traffic arrangement was a mere device to enable Telefunken to make profits by contemplated infringements, and slip them out of the jurisdiction of the court."

One need only examine the history of litigation above referred to by citation of decisions, to be assured of the honestly arguable and uncertain, if not doubtful, nature of these plaintiffs' rights as viewed with the eyes of 1914. The American patentees have been victorious in the courts of the United States; but it is going very far even in argument to assert or suggest that when this contract was made Telefunken made it for the purpose of infringing with comparative impunity patents of which there is no evidence in this record that it had any contemporaneous knowledge—much less belief in their validity. We may add that if that had been the design, intent, or purpose of Tele-

funken, the contract of 1914 was a singularly clumsy overt act of conspiracy.

[7] If it be assumed, however, that such design was within the corporate mind of Telefunken, it follows that Atlantic was a coconspirator, although a humble one; also, that both Telefunken and Atlantic were joint infringers. Therefore they are at law jointly and severally liable for whatever damages plaintiff may be able to show; but as none has been shown, that liability may be laid aside.

[8] Thus if two or more conspire to gain profit by infringement, the question arises: Is each conspirator severally liable not only for the entire damages caused by the infringement, but for the profits made by all the conspirators? We think no authority can be shown, nor can reason be invoked, for a ruling in the affirmative. In Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000, both the city and the contractors who were laying the infringing pavement were made defendants. It was never doubted that the city was as much an infringer as the contractor; the defendants answered jointly and both had decree against them; yet even under such circumstances Bradley, J., remarked, "Profits only, as such can be recovered;" and since the city was not shown to have made any profit although it had used the infringing article, decree for profits passed only against the contractor. Indeed the whole theory of accounting, of profits, and of the quasi fiduciary relation (even when arising ex maleficio) of trustees, is opposed to such a theory of responsibility. The foregoing is said to show to what lengths plaintiffs must go to support recovery; even if a conspiracy to prevent patentees' recovery be assumed. But we ground decision on the finding and holding that there can be no recovery of profits from a defendant, except of profits that defendant made; and this defendant had no "profit" until it had made the payments due under the lawful traffic agreement.

The remaining question at bar, as to the proper apportionment of profits to and among a plurality of plaintiff-patentees, is in the light of the past history of patent accounting a curious puzzle; of which we are especially unwilling to attempt the solution now that the Act of February 18, 1922, has amended R. S. § 4921. It is true that the recent statute does not apply here, because these litigations were pending when the amendment became effective. But these cases belong to a vanishing class, and any elaborate consideration of rules which it was the very object of the amendment to simplify if not to abolish is undesirable from every point of view.

[9] It is sufficient for us to say that we are satisfied by all the evidence that without the use of the Fleming valve, and the principles of heterodyne reception and continuous wave transmission, this particular business out of which these particular profits arose would not and could not have been commercially successful. One may doubt whether the pecuniary success of wireless communication between 1914 and 1917 was not in a very true sense more a growth of war necessities than of scientific perfection and commercial reliability; but that does not affect the truth of the first proposition. Under such circumstances, there is authority too abundant to need citation justifying the master's conclusion as hereinabove set forth.

The decrees appealed from are reversed, and the causes remanded, with direction to enter decree in conformity with the report of the master. Appellant will recover one bill of costs in this court; plaintiffs will recover the costs of the District Court.