[L. A. No. 14758. In Bank.—March 21, 1935.]

XTH OLYMPIAD COMMITTEE OF THE GAMES OF LOS ANGELES, U. S. A. 1932, LTD. (a California Corporation), Respondent, v. AMERICAN OLYMPIC ASSOCIATION (a Voluntary Unincorporated Association), Appellant; STATE OF CALIFORNIA, Intervener and Appellant.

Combs & Combs, Mitchell, Silberberg & Knupp and Peery Price for Appellant.

U. S. Webb, Attorney-General, and Warner I. Praul, Deputy Attorney-General, for Intervener and Appellant.

Flint & MacKay, William A. Bowen and Edward L. Compton for Respondent.

THOMPSON, J.—Plaintiff corporation commenced this action against defendants for declaratory relief—seeking to have it determined that it had the right to dispose of the proceeds of the Xth Olympic games held in Los Angeles during 1932. The plaintiff proposed to retire all outstanding bonds issued by the state to finance the holding of the games and known as California Tenth Olympiad bonds, and, in addition, to turn over to the state a sum equaling the remainder of the total sum received by it as proceeds from the bonds and thereafter, if any funds remain, to divide them between the city of Los Angeles and the county of Los Angeles through the Community Development Association, Ltd. The State of California intervened in the action, claiming that the proceeds of the games belonged as of right to it. The American Olympic Association, brought in by amendment to the complaint, also asserted its claim of right to the funds. The trial court found that the proceeds belonged to plaintiff to be distributed by it free from any claims of the defendants. The State of California (the notice of appeal also naming the California Olympiad Commission) and the American Olympic Association prosecute this appeal from the judgment.

There are a few facts necessary to an understanding of the controversy and common to both appeals. In 1892 Baron Pierre de Coubertin of France proposed a revival of the ancient Olympic games, and beginning with 1896, when the first modern Olympic contests were held in Athens, the games, with many nations competing, have been arranged regularly every four years with the exception of the year 1916 when the World War rendered impossible the friendly intercourse and competitive participation of most of the great nations. The central body is known as "The International Olympic Committee", which is charged with the duty of fixing the times and places for the celebration of the olympiads. After the designation of the place the National Olympic Committee of that nation is entrusted with the organization and management of the games, or the last-named committee may delegate its powers to a special organizing committee "whose officials thenceforth correspond direct with the International Olympic Committee". (Hereafter we shall treat in more detail with this

provision for delegation or transfer of authority.) Subsequent to the naming of Los Angeles as the place for the holding of the games of the Xth Olympiad the plaintiff corporation was organized, and named by the national committee as the special organizing committee charged with the responsibility of organizing and managing the games thereof. The State of California issued and sold Tenth Olympiad bonds in the principal sum of $1,000,000 "for use in connection with the holding and staging of the Olympic games". The California Olympiad Commission, named in the act providing for the bonds, audited and the state treasurer paid claims made by the respondent corporation upon the proceeds of the bond issue, and funds realized from the bonds were applied in the payment of liabilities incurred by respondent in arranging for and conducting the games. Admissions were sold to the public, concessions were let and from this source and salvage the respondent realized a sum which it does not desire nor does any of its members wish to retain, but which it desires to distribute in the manner already stated.

With these preliminary facts before us we shall turn to the

### Appeal of American Olympic Association.

The contentions of appellant American Olympic Association, which for the sake of convenience we shall hereafter designate as the National Committee, are two. First, it asserts that the respondent, the Organizing Committee, was its agent and hence the funds belong to it, and, second, that the fund was raised for a charitable purpose, that of promoting peace and good will among the nations through the instrumentality of the games; hence a charitable trust arose, and inasmuch as the immediate purpose for which the money was raised is incapable of further performance, the funds should be distributed to it as representing the nearest cognate purpose. ▮ Considering these arguments in order, let us observe that the first is based largely upon certain language found in the general rules governing the observance of the olympiads. Our attention is especially directed to the opening paragraph of the "Regulations and Protocol for the Celebration of the Modern Olympiads and of the Quadrennial Games", wherein we read as follows: "The International Olympic Committee in accordance with its

established rights having previously fixed the time and place for the celebration of the next Olympiad . . . entrust the organization to the National Olympic Committee of the country in which the chosen town is situated. This country can delegate the duties to which it has been entrusted to a special organizing committee chosen by itself and whose officials shall thenceforth correspond direct with the International Olympic Committee. The powers of this special committee expire with the period of the games in such a case." The quoted language is from the English translation. Section 14 of the "Statutes of the International Olympic Committee" reads: "The French language is the official language of the committee. In case of divergence between the texts, the French text only is to be accepted." Relying upon this provision the respondent observes a difference between the English text quoted above and the French. It is pointed out that the statement "This country can delegate the duties . . . " is taken from the French phrase "Ce Comite peut Deleguer le mandat . . . " and it is claimed that the latter expression is more properly rendered into English by saying: "This committee may transfer the mandate . . . " and it is argued that when so read in connection with other portions of the rules it becomes manifest that the organizing committee was never intended to become the agent of the National Committee. We are compelled to agree with this contention. In the first place, we find by reference to Clifton & Grimaux's New French-English Dictionary (p. 284) the verb "deleguer" has the meaning " (a) to send with power to transact business; (b) to instruct, to commit". The French word "mandat", according to the lexicographer, has the same meaning as our word "mandate" —an order, command, charge. Therefore the literal translation would be: This committee may commit the command or may transfer the charge. When this literal interpretation is considered in connection with the fact that upon its assumption of responsibility the organizing committee corresponds directly with the International Committee without any supervision by the National Committee it immediately becomes apparent that a new committee independent of the national body was contemplated. This view is reenforced by other provisions of the general rules. Section 8 thereof reads: "The organizing committee of the country chosen

for the celebration of the Olympic Games is responsible for the Games and must make all the necessary arrangements. It must carry on all correspondence relating to its work and send out official invitations to the different nations after agreement with the Executive Committee of the I. O. C." The first paragraph of section 12 as rendered in English reads as follows: ''The sole responsibility and control of the Games shall vest with that National Committee to whom the organization of the Games has been entrusted, such organization to be carried out in accordance with the regulations and protocol of the Olympic Games.'' But here the use of the word ''National'' is doubtful because the French text refers only to the committee organizer in these words: ''Le Comite Organisateur.''

Furthermore, a detailed study of the rules and the duties imposed upon the organization committee discloses that upon it rested the financial as well as actual responsibility of providing quarters and food for the competing athletes; of paying the expenses of technical delegates chosen by the international federation after their arrival and before the start of their sport; of making all necessary arrangements for the games; which must be taken to include those things which the evidence discloses were done by respondent, such as providing suitable stadiums for usual track and field sports, swimming, wrestling and boxing, rowing, equestrian sports, cycling, shooting, etc., all of which required the expenditure by it and not by the National or International Committee of large sums of money. Nowhere can we find where either of the two named committees assumed any financial liability for any of the things done by the respondent. It would shock our sense of justice to feel that under such circumstances we were compelled to hold that respondent, having been successful in its undertaking, is answerable as an agent to either. Happily from the foregoing discussion it appears that the only fair and reasonable construction to place upon the governing articles and rules as well as the acts of all parties is that the organizing committee was independent except in so far as it was necessary for it to submit to the usual and customary usages and formalities of the International Olympic Committee.

We therefore turn to examine the question of whether the funds thus realized were dedicated to a chari-

table trust. Our survey has convinced us that this theory falls upon the very fundamental requisite to such a trust. It cannot be gainsaid that in order for it to be said that a charitable trust has arisen there must be evidenced an intention to devote a fund to a charitable purpose. Here the respondent undertook a large business enterprise. It received from the state funds for the purpose of paying necessary expenditures. (As will hereafter appear the state did not contribute its funds for the purpose of creating a charitable trust.) It sold tickets to enable many thousands of people to observe the best athletes of the world in competition, and after the celebration was completed it salvaged from its housing and other facilities a part of the funds on hand. We may properly assume that in addition to the primary purpose of financing the holding of the games and promoting good will for California, the organizing committee was moved by the general benevolent purpose of the Olympic games, but we fail to find any evidence of an intent to devote and dedicate funds to the furtherance of education or international peace and good will, or any other charitable purpose. We can see no similarity between the situation presented and the contribution of funds directly or through bazaars, where the donors know that the fund is being raised to build a church, or to further some other religious undertaking. Here we are concerned with amateur athletic and other contests, not unlike those which are continually occurring between representatives of our various universities, except that in the present instance it took on the character of international competition. However, looking specifically to the purpose for which the funds were contributed by the state, and it must be remembered that the organizing committee was able to secure an amount not greatly in excess of that given by the state, we may now refer to the argument advanced to the voters of California for the purpose of persuading them to vote an approval of a constitutional amendment confirming the legislative action providing for the issuance of the bonds. We there read: ''The Olympic games are recognized as one of the world's greatest attractions to the country and state in which they are held. When representatives of forty-six nations, composing the International Olympic Committee, voted the Tenth Olympiad to California, they conferred a great honor

upon this state and nation, as the Olympiad, held only every four years, possesses so many benefits that other nations and states constantly seek it. The Olympic games comprise scores of thrilling sports events, many gigantic productions, which will be scheduled almost continuously on water, in stadiums, auditoriums and sports fields of this state during nearly the entire year of 1932. During this long period, the spotlight of world attention will be focused on California. It is probable that as many as 20,000 athletes and representatives in the many branches of sports from all the nations of the world will be competing to bring honor to their countries. The world press will for nearly two years carry news almost daily from California, exemplifying what is considered one of the greatest advertising mediums known. Unprecedented thousands of visitors from all of America and other countries will come to California to see the games and to tour our state. Many conventions are already being scheduled for California in the Olympic year. The material benefit of the Olympic games to California, therefore, is obviously far greater than the costs. Of vital importance, also, is the fact that through the Olympic games, nations of the world find opportunities for closer relationships and better friendly understandings on the field of athletic competition. Sports in the educational and athletic institutions of America are making for clean bodies and clean minds in American youth who will thus be better equipped to lead this nation in the future. Particularly is this true in California where our youth have developed an unexcelled record in athletics. This state is the sports playground of America and with the Olympic games in 1932, will be the playground of the world. The Olympic games will be a tremendous inspiration to our citizens and children, exerting an influence for good that will be felt for generations. California will add another page to its glory, and in history will be credited with having staged the Olympic games which had their inception in ancient Greece, for the first time on the shores of the Pacific. These are some reasons why our legislature voted a bill and constitutional amendment to aid in staging of the Olympic games in this state in 1932, and why the voters are asked to approve that action. It appeals to us that it is proper to have the state aid in so worthy and beneficial a proposition.'' The conclusion is irresistible that

there was not an intent to devote the funds to a charitable purpose.

We therefore turn to a consideration of the

*Appeal of the State of California.*

Preliminarily it should be noted that this appeal is largely academic for the reasons already stated, that respondent proposes to donate to this appellant sufficient to retire the bonds issued to promote the games. However, the state's argument, like the former, is twofold and may be succinctly stated as follows: The state is the beneficiary of a resulting trust and the respondent was the agent of the state.

We shall reverse the order stated and first consider the question of whether the organizing committee was the agent of the state. The act providing for the issuance of the bonds sheds light upon the problem. The provisions which bear upon the question read as follows:

"Sec. 9. The purpose of this act is to provide funds for use in connection with the holding and staging of the Olympic games in California in 1932; to provide facilities for same, to encourage and assist the participation therein by persons from all parts of the world; to establish a commission to represent the State of California in the carrying out of this purpose and to cooperate to the fullest extent therein with the government of the United States and with other persons, corporations and agencies, and to engage in such activities as may be necessary or desirable to make the holding of said Olympic games in California a success. The commission is hereby authorized and empowered to expend the moneys deposited in the California Tenth Olympiad fund for the purpose of carrying out any and all of the above purposes.

"Sec. 13. For the purpose of carrying into effect the provisions and purposes of this act the commission shall have power to make and enter into such contracts and agreements with the corporation hereinafter in this section referred to as it shall deem necessary or advisable, to bring about the union or joint action of the commission and said corporation. The corporation above referred to and contemplated by this act is a corporation to be formed under the laws of this state, for the purpose of conducting, managing, supervising and assuming responsibility for the holding

of the events constituting the Olympic games to be held in the State of California in the year 1932, and all activities in connection therewith, in accordance with the rules and regulations of the international Olympic committee for the holding of the Tenth Olympiad; such corporation to be organized and controlled by citizens of this state of recognized responsibility and having the official recognition of the members of the international Olympic committee representing the United States of America; such official recognition may be sufficiently evidenced by the filing with said commission of a statement signed by said representatives that said corporation is the corporation organized for the above purposes, and that it is recognized as such by the international Olympic committee. Said corporation not yet formed may be referred to in this act as the Olympiad corporation. It is contemplated by this act that the Olympiad corporation will assume responsibility for the holding and staging of the said Tenth Olympiad in California, under the sanction of, and in accordance with, the rules and regulations of the international Olympic committee; that the commission will cooperate to the fullest extent with the Olympiad corporation to the end that all moneys in the California Tenth Olympiad fund shall be expended to the best possible advantage in assisting toward the carrying out of the above purposes in full and complete harmony with the plans of the Olympiad corporation.

"Sec. 14. The contract, or contracts, if any, entered into by the commission with the Olympiad corporation shall be construed to include a provision, whether specifically written therein or not, giving to the commission and its authorized representatives the authority to examine the books, records, contracts, accounts and vouchers kept by the said Olympiad corporation at all reasonable times.

"Sec. 15. The commission shall ask and demand that in the expenditure of any fund in connection or conjunction with the fund herein described, proper books of account shall be kept and maintained and an appropriate accounting system shall be had, and that such records and books shall be maintained and kept within the city of Los Angeles as will enable a person of ordinary understanding, from the inspection thereof, to determine the source and amount of all income and moneys received and the exact purpose in detail

for which expenditures are made or moneys paid. Said books of account shall be open for inspection by any authorized representative of the commission.

"Sec. 16. The State of California shall not in any manner or under any circumstances be liable for any of the acts, doings or proceedings of any person, association or corporation with whom the commission shall act, cooperate, or join to carry out the purposes of this act, nor for the services, salary, labor or wages of any officers, agents, servants or employees of such person, association or corporation, nor for any debts, liabilities, or expenses of any kind whatsoever of such person, association or corporation; *provided, however,* that the commission may, in its discretion, employ the same persons, servants, agents or officers that may be employed by such person, association or corporation with which the commission shall act, cooperate and join to carry out the purposes of this act, and contribute to pay the whole or any part of their compensation." (Stats. 1927, p. 518.)

It will immediately be observed that there is not only no suggestion of agency, but also an express disavowal of responsibility as well as an entire failure to provide that the state should share in the returns, if any.

The state's contribution to the Panama-Pacific International Exposition was made upon the condition that it share in the proceeds. (See *Panama-Pacific International Exposition Co.* v. *Panama-Pacific International Exposition Commission,* 178 Cal. 746–748 [174 Pac. 890].) The decision of this court in that case is persuasive of the conclusion here that there was no attempt to make the organizing committee an agent of the state. In the cited case the principal question was whether the state was entitled to five-elevenths or five-sixteenths of the proceeds, the state having contributed in round figures the sum of $5,000,000 with the express understanding that it should "share proportionately with the contributors to the said Panama-Pacific International Exposition in the returns", and the stockholders having paid in $6,000,000, and the city and county of San Francisco having contributed $5,000,000 without a provision corresponding to that of the state. It was determined that the state was entitled to five-elevenths instead of the smaller percentage, the court saying: "The Company is, of course,

entitled to all the returns from the Exposition, except so far as the law or its own contracts may have otherwise provided. It is agreed that San Francisco donated its five million dollars outright, without exacting the condition that it should have any share of the returns. It was a contributor, but it was not a contributor entitled to a share or interest in the returns. Hence, neither the state nor the Company is required to share the surplus with San Francisco.'' In the present case the state is in the same position San Francisco was in the above case. Some significance attaches to the fact that while the act authorizing the Olympic bonds appears to have been patterned after the constitutional amendment authorizing contribution to the Panama-Pacific International Exposition, yet the legislature did not include the proviso with respect to sharing in the returns. We must, in accordance with a well-known rule of statutory construction, assume that it was the legislative intent to make an outright donation. Even more pertinent is the language found in *World's Columbian Exposition* v. *United States,* 56 Fed. 654–673, as follows: ''We think, furthermore, the position that the exposition was exclusively an undertaking of the United States, and the corporation a mere agent, is shown to be untenable by the consequence contended to be deducible therefrom that therefore the corporation, while responsible to the state of Illinois for the proper exercise of its franchises, and to its creditors and stockholders for the proper administration of its affairs and property, might be subjected to obligations which it never incurred, and to indebtedness which it never created, and its ability to discharge its legitimate functions and respond for its legitimate liabilities might be at any moment utterly destroyed. We find no warrant in the documents before us for holding that the corporation occupied any relation involving such results. The original amount of expenditure was defined, and the assumption to pay and the payment of the further amounts rendered necessary by the expansion of the scope of the affair constituted, under the circumstances, no recognition of the right to impose obligation compulsorily and without consent. We perceive no reason for attributing to congress, while disclaiming any responsibility whatever for the acts and doings of the corporation, or liability for its obligations of any kind, or any liability for its own desig-

nated agents beyond specified amounts, the intention that those agents, or either of them, might contract indebtedness independently of the corporation, which the latter would be compelled to pay. In the Philadelphia case the exposition was managed by two bodies organized by authority of congress, yet their rights and property were not regarded as in any legal sense the rights and property of the United States. The Supreme Court held them to be merely organizations through which the people might carry out an enterprise of their own, which was national, in that it had the sanction of the government, but was not therefore a governmental enterprise. (*Eyster* v. *Centennial Board of Finance,* 94 U. S. 500 [24 L. Ed. 188].) The Supreme Court said, speaking through Mr. Chief Justice Waite, that it was very apparent that the object of congress in all its legislation with reference to the Centennial Exhibition was to enable the people of the United States to commemorate 'the completion of the first century of their national existence' by an exhibition 'in which the people of the whole country should participate', and which should have the sanction of the government, and that in that sense the object was national; but that it was equally clear that until the act of 1876 it was expected that the entire expense would be borne by the people without assistance from congress. And as to the appropriation of 1876 it was held, under the terms of the act, that after payment of debts the amount had to be returned before any distribution to stockholders,—a result reached by construing the word 'profits', as used, to be equivalent to 'net receipts'. In that case, as in this, congress, out of abundant caution, lest the enterprise might be regarded as governmental, and, if so, some question might be raised as to the operation of state laws, provided that nothing in the act of congress should be construed so as to override or interfere with such laws or contracts made thereunder; but this was as a measure of precaution, and not by way of a necessary reservation of state jurisdiction, which had not been ceded, and could not be held as surrendered by implication." As we have already observed with respect to a similar contention by the National Committee, it is not reasonable to suppose that the state would disavow all responsibility or liability for the acts of one who was to represent it as agent. Indeed, this appellant, by legislative enactment has put a

similar construction upon the act in question, not only with respect to the contention now being examined, but also with regard to the second argument respecting trusts. On May 15, 1933, the governor approved an act permitting the state treasurer to accept a donation for the retirement or purchase of the California Olympiad bonds (Stats. 1933, p. 966), section 1 of which reads as follows:

"The State Treasurer is hereby authorized to accept a donation for the purpose of meeting the interest and redemption of the Olympiad bonds issued under an act of the Legislature passed in 1927. Any donation made under the provisions of this act shall be set aside in the treasury as a special fund and invested by the State Board of Control, and the interest therefrom shall be used to pay the interest on the outstanding bonds until the fund donated for that purpose shall be sufficient to retire the outstanding bonds and pay the interest thereon, at which time said fund shall be liquidated and used for such purpose."

The legislative enactment, being a construction of the former statute, would seem to set at rest any question of the state's right to claim either as principal or as the beneficiary of a resulting trust.

However, examining specifically appellants' argument in so far as it is urged that the state is entitled to the proceeds upon the theory of a resulting trust, we fail to find therein sufficient upon which to declare that such a trust has arisen. First, it is obvious that the purposes for which the money was raised and expended have been fully realized. In accordance with the act which authorized the bonds, the funds were paid out for expenses upon demands of respondent audited by the Olympiad commission. Hence there can be no resulting trust upon the theory that the purpose for which the funds were transferred has failed in whole or in part. The case lacks the element of intention or assumed intention on the part of the donor, without which equity does not undertake to adjudge a trust. (See Pomeroy's Equity Jurisprudence, 4th ed., vol. 3, secs. 1031, 1032.) Nor does it appear that there was any intention to separate the beneficial interest from the legal title. The plain truth of the situation is that the state subsidized the staging of the Olympic games, without thought of return, other than that which indirectly followed from attracting

people from the world over to join with us here on the Pacific slope in an international friendly contest.

The discussion with respect to the first class of trusts applies in a degree to the second class, it being urged by appellants that the case may be likened to one where A furnishes the consideration but title is taken in the name of B. We have already directed attention to the magnitude of the responsibility assumed by respondent and placed there by statutory enactment, and to the intent to subsidize the games. Both of these factors negative such a trust. Furthermore, the evidence discloses that the funds realized and the subject-matter of this action were largely from the sale of tickets to those who witnessed the contests. Again, we are faced with the legislative failure to provide that the state should share in the returns as well as the practical construction involved in the act authorizing the acceptance of the donation for a particular purpose.

It follows that the judgment should be and it is affirmed.

Shenk, J., Waste, C. J., Curtis, J., Langdon, J., and Seawell, J., concurred.